*Pizza di Joey, LLC and Madame BBQ, LLC v. Mayor and City Council of Baltimore*, No. 41, September Term, 2019. Opinion by Biran, J.

**JUDICIAL REVIEW – DECLARATORY JUDGMENT ACT – JUSTICIABILITY – RIPENESS – STANDING –** Court of Appeals held that mobile vendors' substantive due process and equal protection claims were justiciable in a declaratory judgment action brought under Md. Code, Cts. & Jud. Proc. § 3-409(a)(1) (1973, 2013 Repl. Vol.). Mobile vendors' challenge to Baltimore City Code, Article 15, § 17-33, which prohibits them from parking their food trucks within 300 feet of a competing retail establishment ("300-foot rule"), was ripe. Enforcement of the 300-foot rule restricts where mobile vendors may operate and affects their potential profitability, resulting in concrete, specific claims of constitutional violations. The Court also held that the mobile vendors in this case had standing to challenge the 300-foot rule. They established at trial that they were directly affected by the 300-foot rule.

**MARYLAND DECLARATION OF RIGHTS – ARTICLE 24 – EQUAL PROTECTION – SUBSTANTIVE DUE PROCESS – BALTIMORE CITY CODE, ARTICLE 15, § 17-33 – RATIONAL BASIS REVIEW –** Court of Appeals held that the proper level of judicial scrutiny for the 300-foot rule is rational basis review. The Court held that the 300-foot rule is rationally related to Baltimore City's legitimate interest in ensuring the economic vibrancy of its commercial districts. The 300-foot rule furthers this interest by addressing the "free rider" problem that exists when food trucks are able to park too close to restaurants that primarily sell the same type of food products. Thus, the Court held that the 300-foot rule does not violate mobile vendors' rights to substantive due process and equal protection under Article 24 of the Maryland Declaration of Rights. Even reviewed under the less deferential heightened rational basis test, the 300-foot rule is constitutional because it bears a real and substantial relation to Baltimore's legitimate interest in ensuring the vibrancy of its commercial districts.

**COURTS – WAIVER – APPELLATE REVIEW –** Court of Appeals held that, where mobile vendors affirmatively waived vagueness challenge, circuit court erred in holding the 300-foot rule void for vagueness on its own initiative. An appellate court has discretion to give effect to a party's affirmative waiver of a claim for relief in the trial court, despite the trial court having decided the question on its own initiative.

**MARYLAND DECLARATION OF RIGHTS – ARTICLE 24 – VOID-FOR-VAGUENESS DOCTRINE – FACIAL CHALLENGE –** The Court of Appeals held that a facial vagueness challenge to the 300-foot rule is permissible. On the merits of that claim, the Court held that the 300-foot rule is not void for vagueness. Mobile vendors failed to show that there is no set of circumstances under which the 300-rule is valid. In addition, the language of the 300-foot rule is not so broad as to be susceptible to irrational and selective enforcement.

Circuit Court for Baltimore City
Case No. 24-C-16-002852
Argued: February 6, 2020

IN THE COURT OF APPEALS

OF MARYLAND

No. 41

September Term, 2019

---

PIZZA DI JOEY, LLC AND
MADAME BBQ, LLC

v.

MAYOR AND CITY COUNCIL
OF BALTIMORE

---

McDonald
Watts
Hotten
Getty
Booth
Biran
Raker, Irma S.
    (Senior Judge, Specially Assigned),

    JJ.

---

Opinion by Biran, J.
Raker, J., dissents.

---

Filed: August 17, 2020

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

"There ain't no such thing as a free lunch."

– adage popularized as the acronym "TANSTAAFL" in
*The Moon Is a Harsh Mistress* by Robert A. Heinlein (1966)


According to one scholar, in nineteenth-century America, "cities were regarded almost purely as economic entities." Dennis R. Judd, *The Politics of American Cities: Private Power and Public Policy* 2 (1979). Thus, in that era, "[l]ocal politics could be defined as the enterprise of protecting and promoting economic vitality." *Id.* In modern America, Baltimore City and other local governments have had more on their plates when promoting the general welfare than just ensuring economic vitality. In 2020, the coronavirus pandemic and concerns about racism in policing have dominated civic discourse in Maryland and throughout the nation. In Baltimore City, policymakers and concerned citizens have confronted issues relating to equality and policing (and other social issues) for many years prior to this one. Nevertheless, promoting and maintaining economic strength remains an important governmental interest in Baltimore and other cities. Without economic strength, cities struggle to remain vibrant, as tax bases shrink and public safety challenges increase. Promoting a city's general welfare requires that local lawmakers balance competing interests and make sometimes difficult choices. This case concerns Baltimore City's efforts to balance the interests of brick-and-mortar restaurants and food trucks.

Joseph Salek-Nejad, known professionally as Joey Vanoni, and Nicole McGowan are the respective owners of Pizza di Joey, LLC ("Pizza di Joey") and Madame BBQ, LLC

("Madame BBQ"). Since 2014, both Pizza di Joey and Madame BBQ have been part of Maryland's food truck industry, with Pizza di Joey primarily operating in Anne Arundel County and Madame BBQ (rebranded in 2016 as MindGrub Café) in Howard County. Pizza di Joey and Madame BBQ (collectively, the "Food Trucks") seek to operate in Baltimore City, but contend that they are unable to do so due to a provision in Baltimore's street vending ordinance that restricts a food truck from parking within 300 feet of a brick-and-mortar restaurant that primarily sells the same type of food (the "300-foot rule" or the "Rule").

The Food Trucks filed suit in the Circuit Court for Baltimore City against the Mayor and City Council of Baltimore (the "City"), claiming that the 300-foot rule violates Article 24 of the Maryland Declaration of Rights by restricting the Food Trucks' ability to practice their trade. Specifically, the Food Trucks alleged that the 300-foot rule's restraint on their ability to operate their businesses in Baltimore deprives them of equal protection and substantive due process of law under Article 24. At a bench trial, the City introduced expert testimony from an economist, who testified that the 300-foot rule addresses a "free rider" problem posed by food trucks siphoning business from brick-and-mortar restaurants after those restaurants have invested their resources and become semi-permanent members of the neighborhoods in which they are based. The City's expert testified that, while food trucks provide an important service, they threaten the vibrancy and viability of the City's commercial districts if allowed to operate too closely to brick-and-mortar establishments that sell primarily the same type of food.

2

After receiving evidence from both sides, the circuit court held that the 300-foot rule does not violate Article 24's requirements of equal protection and substantive due process. However, despite the Food Trucks' explicit disavowal of a claim based on the procedural due process doctrine of vagueness, the court enjoined the City from enforcing the 300-foot rule, concluding on its own initiative that the Rule is impermissibly vague.

The parties cross-appealed to the Court of Special Appeals, which ruled in favor of the City. The intermediate appellate court agreed with the circuit court that the 300-foot rule does not deprive the Food Trucks of substantive due process or equal protection under Article 24. However, the Court of Special Appeals reversed the circuit court's grant of injunctive relief, holding that the Food Trucks had not preserved a vagueness claim for appellate review, and that such a claim failed on the merits in any event.

The Food Trucks appealed to this Court. For the reasons discussed below, we agree with the Court of Special Appeals that the 300-foot rule is constitutional.

## I

## Background

**A. Food Trucks**

Not every city has had the same experience with food trucks over the past decade. In some cities, the emergence of food trucks has been viewed as a wholly positive development. In other cities, the relationship between food trucks and established businesses and the local citizenry has been more complicated. But there is no doubt that food trucks have become increasingly popular and prevalent in Baltimore and many other American cities over the past decade.

However, the idea behind a kitchen on wheels is not novel. In 1866, Charles Goodnight repurposed a military wagon into a mobile kitchen for cattle farmers traveling along Western trails. *See* Clay Coppedge, *Good Eats on the Range*, available at http://www.americanchuckwagon.org/images/CWarticle.pdf (accessed on July 15, 2020), archived at https://perma.cc/YLU6-6L66. Known as the chuck wagon, its popularity and uses expanded over the following century. After enjoying a steak at an event in Colorado, former President Theodore Roosevelt mounted a chuck wagon and spoke of the "great comfort" they provided on the frontier. *At the "Chuck Wagon Lunch"*, *Baltimore Sun* (Aug. 30, 1910). In the 1930s, a "restaurant on wheels" could travel to different destinations at a moment's notice. *"Old Hutch" Feeds Famous Folk: Restaurant on Wheels is Site of Many Quick Repasts in Wilds*, *Washington Post* (Aug. 9, 1936). In 1949, a restaurant in Little Rock, Arkansas styled a Jeep after a chuck wagon and used it to cater parties and events. *Chuck Wagons Roll Again*, *Wall Street Journal* (Mar. 14, 1949).

The mobile food industry took a different form in cities. Vendors have sold food from pushcarts in New York City for hundreds of years. *See The Complete History of American Food Trucks*, available at http://www.mobile-cuisine.com/business/history-of-american-food-trucks (accessed on July 13, 2020), archived at https://perma.cc/FWR3-RARW. In 1872, Walter Scott cut windows into a wagon parked outside an office in Providence, Rhode Island, from which he sold sandwiches and coffee. Similar "lunch wagons" began to appear in other cities. Devin Gannon, *From oysters to falafel: The complete history of street vending in NYC*, available at http://www.6sqft.com/from-oysters-to-falafel-the-complete-history-of-street-vending-in-nyc (accessed on July 13, 2020),

4

archived at https://perma.cc/P468-FQGG. Near the end of the nineteenth century, nighttime food wagons, known as "Owls," appeared in New York City, serving hot food and drinks after restaurants closed. *Id.* After the advent of the automobile, food wagons eventually became motorized. *Id.*

The person widely credited with creating the first of today's modern "food trucks" was Raul Martinez, who, in 1974 in Los Angeles, converted an old ice cream truck into a mobile lunch wagon serving tacos. *See* Lynn Brown, *The Rise of the Taco Truck,* available at https://daily.jstor.org/rise-of-the-taco-truck (accessed on July 13, 2020), archived at https://perma.cc/D6JW-ZGWX. Six months later, thanks to the popularity of his truck, Mr. Martinez was able to open a brick-and-mortar restaurant called King Taco in Los Angeles, which became a successful chain of restaurants. Mr. Martinez's success led others to try to follow in his footsteps, and "taco trucks" became common in California and the Southwest. *Id.*

One of the first gourmet food trucks to receive national attention was Kogi BBQ in Los Angeles, which used Twitter to develop a fan base for its "Korean Short Rib Taco" and other Korean-Mexican fare. *Id.*; *see also* David Farley, *The taco that's taking the US by storm,* available at http://www.bbc.com/travel/story/20150130-the-taco-thats-taking-the-us-by-storm (accessed on July 13, 2020), archived at https://perma.cc/JZX3-F8TU. Others on the west coast, and soon after on the east coast, took note of Kogi BBQ's success, leading chefs to "scour[] used car lots to find trucks to convert into mobile restaurants." *The Rise of the Food Truck*, available at http://www.restaurantengine.com/rise-food-truck (accessed on July 13, 2020), archived at https://perma.cc/GC6Y-F4MR.

Food trucks have grown exponentially in popularity since the 2008 economic downturn. That recession forced many talented chefs out of traditional restaurants. *See id.* In addition, given the low cost of creating a food truck relative to a brick-and-mortar restaurant, many aspiring chefs have opted to begin their careers with food trucks. *See* Lorri Mealey, *A History of the Food Truck*, available at www.thebalancesmb.com/a-history-of-food-trucks-2888314 (accessed on July 13, 2020), archived at https://perma.cc/VDW5-8BFE; *see also* Brief of *Amicus Curiae* Urban Reform at 3-4 (noting the "relatively low startup costs [of food trucks] in comparison to the high capital requirements and complicated, ever-expanding government regulations that accompany starting traditional businesses" and observing that, for many food truck operators, "[s]treet vending is the first rung on these entrepreneurs' climb up the ladder of economic success") (internal quotation marks and citation omitted). The ascendance of food trucks has been reflected in popular culture, including the 2014 film "Chef," starring Jon Favreau, Robert Downey, Jr., and Scarlett Johansson, and in the television programs "The Great Food Truck Race" and "Food Truck Nation."

Baltimore City is no exception to an increasing number of food trucks in U.S. cities. As of May 2017, there were 65-70 food trucks operating in the City, compared with approximately 25 licensed food trucks in 2011-12.

## B. The City's Regulation of Food Trucks

In 2014, responding to the increasing popularity of food trucks, the City established a series of regulations that apply to the operation of food trucks within its boundaries. The stated goal of the legislation was to promote "entrepreneurship and a vibrant business

climate for food truck vendors and local restaurants," taking into account "pedestrian, traffic and parking concerns" while also promoting "public safety and health." Recitals, Council Bill 14-0305 (First Reader, introduced Jan. 13, 2014).[1] The resulting Ordinance 14-237 (the "Ordinance"), which is codified as Subtitle 17 of Article 15 of the Baltimore City Code, substantially revised the regulations governing street vending in the City. *See* Baltimore City Code, Art. 15, Subtitle 17, Editor's Note.

The Ordinance, which became effective on February 28, 2015, established "special regulatory provisions for mobile vendors." *Id.* As relevant here, a "mobile vendor" is defined as "any person that sells, distributes, or offers to sell or distribute food products … from a motor vehicle on City streets or private property within the City of Baltimore." Baltimore City Code, Art. 15, § 17-1(e)(1). Among other things, the Ordinance sets forth the procedure and requirements to obtain a mobile vending license and creates an administrative appeals process. *Id.* §§ 17-18 & 17-45.[2]

The Ordinance also regulates when and where mobile vendors may park their vendor trucks. Street vendors may not operate between the hours of midnight and 6 a.m. in the absence of receipt of a special event permit that explicitly grants permission to operate

---

[1] The City's overhaul of its laws regarding street vendors was introduced as Ordinance 14-0305. Upon enactment, it was renumbered Ordinance 14-237.

[2] If approved for a license, a street vendor receives a license for a one-year term that can be renewed for an unlimited number of subsequent one-year terms. *See id.* § 17-19. Alternatively, a person may apply for a temporary street vending license that carries a term of four days and can be renewed for at least one additional four-day period. *See id.* § 17-20.

during those hours. *Id.* § 17-36. In addition, the Ordinance provides parking benefits to, and imposes parking restrictions on, mobile vendors. The primary parking benefit that the City provides to licensed mobile vendors is the right to park free of charge in a "mobile vending zone." *Id.* § 17-5. These zones are comprised of designated spaces on City streets or other public property "for the exclusive use of mobile vendors during designated hours." *Id.* § 17-5(a)(1). According to evidence submitted at the trial in this case, without such zones, mobile vendors would have to pay more for parking, and would have to comply with parking time restrictions, which prohibit "meter feeding."[3] A City official explained that mobile vendors had asked the City to provide such vending zones, which "accommodate [their] need for setup time, breakdown time, and [do not] require [them to] pay a disproportionate amount of money for the parking resource on the street."

On the other hand, the Ordinance restricts mobile vendors from parking their vendor trucks in certain places within the City. These restrictions comprise the majority of the prohibitions set forth in Part III of the Ordinance. *See id.* §§ 17-30 through 17-39.[4] The 300-foot rule is one of these restrictions. It provides:

---

[3] The City's Department of Transportation has published regulations which provide, among other things, that "[a] licensed mobile vendor, not assigned to a designated mobile vending location may vend from any legal parking place, … where the following conditions are met: … No mobile vendor may park at a meter without providing the appropriate meter fees; [and] [n]o mobile vendor may 'meter feed' or park in a metered space for longer than the time limit designated as the parking time limit." Street Vendor Program Rules and Regulations §§ 1100(g) & (h); *see also* Baltimore City Code, Art. 31, § 7-17(b) (prohibiting parking in a metered space "for a duration longer than that designated").

[4] In addition to imposing parking restrictions, the Ordinance prohibits street vendors of food products from: (1) operating without sufficient trash receptacles, *id.* § 17-30(a); (2)

8

> A mobile vendor may not park a vendor truck within 300 feet of any retail
> business establishment that is primarily engaged in selling the same type of
> food product … as that offered by the mobile vendor.

*Id.* § 17-33.[5] Three hundred feet is approximately the length of a typical City block. The

term "food product" means "any item used as food, drink, confectionary, or condiment for

human consumption, whether simple or compound." *Id.* § 17-1(c). The phrases "primarily

engaged in" and "same type" are not defined in the Ordinance.

The Ordinance provides for enforcement of its provisions by civil citation. *Id.* § 17-

41. The Ordinance also provides a misdemeanor criminal penalty for any "person who

violates any provision" of the Ordinance. *Id.* § 17-42. Upon conviction, the violating person

"is subject to a penalty of $500 for each offense." *Id.* In addition, the Department of General

Services ("DGS") may suspend or revoke a mobile vending license if the licensee violates

any provision of the Ordinance. *Id.* § 17-44(a)(1). If a mobile vendor commits three

violations of any of the prohibitions set forth in Part III of the Ordinance (including the

---

failing to remove all trash within a 10-foot radius of the place where the vendor truck has
been parked, *id.* § 17-30(b); and (3) operating without keeping a detailed logbook noting
the vendor's daily use of its supporting commissary, *id.* § 17-34(a).

[5] The Ordinance also prohibits mobile vendors from parking their vendor trucks: (1)
in a residential spot for more than 15 minutes at a time every 48 hours, *id.* § 17-35; (2)
within two blocks of a mobile vending zone, *id.* § 17-32; (3) within two blocks of a City
market, *id.* § 17-37; (4) within two blocks of the perimeter of any City-authorized farmers'
market when the farmers' market is in operation, without the written permission of the
farmers' market organizer and holder of the farmers' market permit, *id.* § 17-39; and (5)
from 7 a.m. to 8 p.m., within two blocks of any building used as a public or private
kindergarten, elementary school, or secondary school, or any public transit stop serving a
kindergarten, elementary school, or secondary school, *id.* § 17-38. In addition, no mobile
vending zone may be designated within two blocks of a public or private kindergarten,
elementary school, or secondary school. *Id.* § 17-5(a)(3).

300-foot rule), DGS must revoke that vendor's license. *Id.* § 17-44(b). If a license is revoked, the former licensee may not apply for a new license until at least one year following the date of revocation. *Id.* § 17-44(c).

The City has confirmed that it enforces the 300-foot rule. It does so by asking vendors to relocate or to alter their menus based on the menus of the nearby brick-and-mortar establishments. Enforcement authorities take such action only in response to a complaint that a food truck is parked too close to a brick-and-mortar restaurant. No mobile vendor has received a citation or has had its license suspended or revoked for violating the 300-foot rule.

### C. Pizza di Joey and Madame BBQ

Pizza di Joey and Madame BBQ and their owners, Mr. Vanoni and Ms. McGowan, exemplify many of the greatest benefits of the food truck industry. Mr. Vanoni created Pizza di Joey after his return from a tour of duty in the United States Marine Corps. His fellow servicemembers enjoyed his cooking and encouraged him to get into the food business. Mr. Vanoni tested a variety of pizza recipes before opening his food truck for business in 2014. At the time, he lacked the capital to open a brick-and-mortar restaurant. A resident of the Federal Hill neighborhood in Baltimore City, Mr. Vanoni obtained a mobile vendor license from the City, but, as discussed below, he primarily traveled to Anne Arundel County to operate his food truck, due to the 300-foot rule. There, his business thrived, as Pizza di Joey became known for its New-York style pizza and Italian pastas and salads. In 2019, Mr. Vanoni opened a brick-and-mortar Pizza di Joey restaurant in Federal

10

Hill,[6] but food trucks are still part of his business. He wishes to focus his mobile-vending operation in Baltimore.

Ms. McGowan, owner of Madame BBQ, has worked in the food service industry since she was 15 years old. Barbeque remains a staple offering of her food truck, but since rebranding her business as MindGrub Café in 2016, Ms. McGowan has added a diverse array of healthy food options. Targeting workers in professional occupations, she aims to provide "brain food for knowledge workers." Ms. McGowan originally focused her operation in Howard County but took her truck to Baltimore City through one-day permits for block parties and special events. Like Pizza di Joey, Madame BBQ is currently licensed as a mobile vendor in the City. Ms. McGowan also wishes to focus her food truck business in the City.

Despite having proper licensing and a desire to operate in the City, both Mr. Vanoni and Ms. McGowan have limited their food truck operations in the City due to the 300-foot rule. Mr. Vanoni came to this decision after a University of Maryland police officer approached the Pizza di Joey truck while it was parked in the 800 block of West Baltimore Street. The officer explained to Mr. Vanoni that he had received a complaint from a nearby restaurant that Pizza di Joey was parked too close to the restaurant, and told Mr. Vanoni that he would need to move his truck from that location. After Mr. Vanoni accessed the

---

[6] Thus, Mr. Vanoni appears to be an example of a food entrepreneur for whom mobile vending indeed was "the first rung on [the] climb up the ladder of economic success." Brief of *Amicus Curiae* Urban Reform at 4; *see also* Nicholas Alvarez, *Regulating the Food Truck Industry: An Illustration of Proximity and Sanitation Regulations*, 12 J. Food L. & Pol'y 1, 5 (2016) ("Some food truck owners have been so successful that they are looking into permanent brick-and-mortar spots.").

11

text of the 300-foot rule on his laptop, he was able to convince the officer that he was not selling the same type of food product as the complaining restaurant (which did not sell pizza). Mr. Vanoni continued to operate at that location that day; indeed, the officer returned during the lunch hour and bought a slice of pizza from Mr. Vanoni. Nevertheless, this incident caused Mr. Vanoni substantial concern because it showed that police officers in the City do enforce the 300-foot rule. Although Mr. Vanoni had never been cited or charged for violating the 300-foot rule, Mr. Vanoni worried that he might face a criminal charge and/or put his license at risk if he mistakenly operated within 300 feet of a restaurant that primarily sells the same type of food products. In addition, just engaging in a discussion with police to attempt to avoid enforcement means losing precious operating time. After analyzing the menus of the brick-and-mortar restaurants in two Baltimore neighborhoods where he wants to operate – Hampden and Federal Hill – Mr. Vanoni determined that the prevalence of restaurants that sell Italian sandwiches and pizza in those areas effectively makes it impossible for him to operate there. These factors led Mr. Vanoni to severely cut back the operation of his food truck in the City and instead operate 80-90 percent of the time in Anne Arundel County.

As for Ms. McGowan, Madame BBQ's menu after the rebranding to MindGrub Café became quite varied, as it came to include various salads, soups, and sandwiches, as well as retaining some barbecue items. Ms. McGowan became concerned that the diversification of her menu greatly increased the number of brick-and-mortar restaurants which would be considered as selling primarily the same type of food products as MindGrub Café. Similar to Mr. Vanoni, Ms. McGowan analyzed how the 300-foot rule

12

affected her food truck's ability to operate in certain desirable areas. She concluded that 31 restaurants in Hampden, 50 restaurants in Federal Hill, and 113 restaurants in the downtown area implicated the 300-foot rule with respect to MindGrub Café. Ms. McGowan also would like to operate in Waverly Brewing Company's parking lot on private property, but has concluded that she cannot do so, because Blue Pit BBQ is located within 300 feet, and sells pulled pork sandwiches, as does MindGrub Café. In addition, Ms. McGowan concluded that she cannot legally operate her vendor truck in the parking lot of a commissary she owns in the Locust Point neighborhood because of a nearby restaurant called Barracuda's.

Like Pizza di Joey, Madame BBQ has never been cited for violating the 300-foot rule, nor has Ms. McGowan had any encounter with enforcement agencies with respect to the Rule. But Ms. McGowan became sufficiently concerned about the wide sweep of the Rule and the possibility that she might lose her license, or that she might receive a $500 citation for a violation of the Rule, that she decided not to operate her food truck in the City.

### D. The Litigation

On May 13, 2016, the Food Trucks filed a Complaint in the Circuit Court for Baltimore City, seeking a declaratory judgment and injunctive relief based on their claim that the 300-foot rule violates their rights under Article 24. The City moved to dismiss the Complaint; the circuit court denied the motion to dismiss.

On October 18, 2016, the Food Trucks filed an Amended Complaint, which alleged that, by interfering unreasonably with their right to earn a living, the 300-foot rule: (1)

13

violates the Food Trucks' right to equal protection under Article 24, both on its face and as applied to the Food Trucks (Count I); and (2) violates the Food Trucks' right to substantive due process under Article 24, both on its face and as applied to the Food Trucks (Count II). The Food Trucks sought declaratory and injunctive relief, a nominal one-dollar award of damages, as well as costs and attorneys' fees. The Food Trucks did not include a claim that the 300-foot rule is unconstitutionally vague in either the original Complaint or the Amended Complaint.

The parties engaged in discovery and then filed cross-motions for summary judgment. In its motion for summary judgment, the City argued, among other things, that the Food Trucks' claims were not ripe because neither Pizza di Joey nor Madame BBQ had suffered any cognizable injury from the 300-foot rule. During oral argument at the hearing on the motions for summary judgment, counsel for the Food Trucks stated that the Food Trucks had "not brought a vagueness argument."

The circuit court denied both summary judgment motions. As to the City's argument regarding ripeness, the court found that at least one of the plaintiffs had "demonstrated sufficient facts" to show a "credible threat of prosecution."

On September 28-29, 2017, another judge of the Circuit Court for Baltimore City presided over a nonjury trial of the Food Trucks' claims. Both Mr. Vanoni and Ms. McGowan testified in the Food Trucks' case-in-chief, explaining how they wanted to operate their trucks in the City but had altered their business plans based on their conclusion that they were not able to operate effectively in the City without risking sanctions for violating the 300-foot rule. They introduced into evidence maps showing how the 300-foot

14

rule prevents them from parking anywhere in certain neighborhoods of the City in which, but for the Rule, they would sell their food products. Mr. Vanoni also testified about his encounter with the University of Maryland police officer who was attempting to enforce the 300-foot rule.

Notwithstanding their determinations that the 300-foot rule prevented them from operating in certain areas, both Mr. Vanoni and Ms. McGowan also testified that one of the reasons they find the Rule problematic is that they do not know what it covers and what it does not. For example, when asked what "the same type of food product" means to him, Mr. Vanoni answered: "[I]t's really pretty broad. Is it pizza? Is it flatbread? Specifically with Pizza di Joey, … is it cuisine? Italian? American? Italian-American? Sandwiches? I mean, are we talking like the form of the cuisine? The style of it?" While Ms. McGowan offered that at least one comparison was "easy" for her to make – both her truck and a restaurant called Harbor Que sell barbecue – she was not "totally sure" if she would be permitted to park within 300 feet of Blue Hill Tavern, which (like her truck) has chicken sandwiches, salads, and soup on its menu.

The Food Trucks introduced transcripts of depositions given by two City officials with knowledge of, and responsibility for, enforcement of the 300-foot rule. Among other things, those officials testified that the City has not created a document that provides guidance to the departments with enforcement authority concerning standards to apply in enforcing the Rule. However, the officials testified that they applied "commonsense" definitions to the phrases "primarily engaged in selling" and "same type" of food product. Thus, when asked whether pizza is the same type of food product as flat bread, one of the

15

City officials answered that he was unaware of the City having "established a formal position on whether or not those two things are similar or equal," but stated that he would "argue that flat bread is flat bread and pizza is pizza." The officials acknowledged that the 300-foot rule is "not an easy rule to enforce" and requires those with enforcement authority to conduct a "subjective analysis" on a "case-by-case basis" whether a restaurant is "primarily engaged in selling" the "same type" of food product as a mobile vendor. The officials explained that there were several factors that could be considered when conducting this analysis, including: (1) the specific items on the respective menus of the food truck and the brick-and-mortar restaurant; and (2) whether the food truck and nearby restaurant offered the same kind of cuisine.

The City called one witness in its defense case: Anirban Basu, who testified as an expert in applied economics. Mr. Basu, who has advised multiple Maryland municipalities regarding economic development strategies, explained that "[a] city has to deliver[] a value proposition that attracts people. Without people[,] cities cannot be financially or economically valuable." Mr. Basu testified that Baltimore City's commercial districts are vital in delivering that value proposition to people because they are sources of tax base and jobs. He further opined that commercial vacancies detract from the vibrancy of the City's commercial districts by negatively affecting the perception of public safety:

> [P]eople are taking cues from their environment. If they see a lot of vacant space they see a lot of hopelessness. Often vacant space associated with deteriorating physical conditions of buildings. That also sends out signals to people. And people often respond with their behaviors to those signals. So what you want is very vibrant commercial districts ... low vacancy rate....

Mr. Basu further explained that vacancies in the City's commercial districts make

16

it more difficult to attract new businesses to those areas

> because again it sends a signal to potential tenants that this may not be the place for them.... [O]ne of the things you tend to see in commercial real estate is that an area that has suffered high vacancy often continues to suffer high vacancy.... So vacancy breeds vacancy. And it's very difficult once a commercial area stops being vibrant to bring that vibrancy back. And we see that throughout Baltimore.

In Mr. Basu's opinion, brick-and-mortar restaurants are a very important part of maintaining the vibrancy of the City's commercial districts because they are major employers, and also "energize the street-scape," thereby encouraging visitation of the City.

While Mr. Basu recognized that food trucks provide the same important service as brick-and-mortar restaurants and also contribute to the vibrancy of a commercial district, he explained that food trucks invest less in the City than their stationary competitors and provide fewer financial benefits for the City:

> Restaurants are semi-permanent members of their community.... Food trucks by definition are mobile. They're not affixed to a particular community. They're not necessarily pillars of their community. And of course, they're not in [the] brick and mortar context. And so they're not generating property taxes, directly or indirectly, the way that a restaurant would…. [T]he typical restaurant employs far more people than the typical food truck….

Mr. Basu explained that a typical restaurant entrepreneur invests approximately four times as much money as a food truck entrepreneur to open for business. Thus, while "[b]oth are taking risks [and] are to be respected for taking those risks, … the restaurateur on average is making a much larger gamble financially than is a typical food truck entrepreneur." And brick-and-mortar entrepreneurs do not just gamble on their ability to attract and retain customers through the quality of the food offerings; they also gamble on the vibrancy of the City neighborhood in which they choose to set up shop. In this regard, Mr. Basu

17

compared the different courses of action available to food trucks and the City's brick-and-mortar restaurants after the Baltimore riots of April 2015. Putting himself in the shoes of both a restaurateur with a brick-and-mortar location on Monroe Street in West Baltimore and the operator of a food truck that frequents the same neighborhood, Mr. Basu explained that, as a result of the unrest in the neighborhood, the brick-and-mortar restaurateur has

> a problem because I am committed to that location. But if I'm a food truck operator, I get to move…. Maybe I'll move to the area around Loyola University, which happens to be home to a food truck zone, or maybe I'll move to the University of Maryland, or maybe I'll move to the University of Baltimore, or Wabash Avenue…. I've got choices. I'm not committing to a particular part of the City. And so if public safety deteriorates in one part of the city, I move to another. In fact, … there's nothing stopping me from leaving Baltimore City. Why don't I go to Towson or some other place? I'm not committed to the City. My business is on wheels. But that restaurant entrepreneur on Monroe Street or Greenmount, they're committed to the City. They're committed to the space. They have a lease. They may actually own the building in which they operate. That's not uncommon. And so that is an enormous source of risk. So not only are they risking more capital, they're making a bigger bet on the City of Baltimore.

For these reasons, Mr. Basu testified, it is sensible for the City to take steps to try to ensure the viability of brick-and-mortar restaurants. One such step, according to Mr. Basu, is the 300-foot rule, which addresses a "free rider" problem that exists when food trucks park near a competing brick-and-mortar restaurant. Using a brick-and-mortar pizzeria in the Fells Point neighborhood as an example,[7] Mr. Basu explained the problem and what might happen if the City did not address it:

---

[7] We glean from Mr. Basu's testimony that he was referring here to BOP, a Fells Point restaurant that stands for "Brick Oven Pizza." The transcript refers to "Bob Pizza." We are aware of no pizza restaurant in Fells Point called "Bob Pizza" or "Bob's Pizza." Thus, we have changed "Bob" to "BOP" in quoting from this portion of Mr. Basu's testimony.

[L]et's say a pizzeria creates a reputation. People say I want to go to BOP Pizza…. [T]hat restaurant is essentially paying property taxes all day and night, but … a food truck can come during an advantageous part of the day just when the market is hottest, just when BOP Pizza could generate the most revenues on a per hour basis and I'm going to sit in front of BOP Pizza at that time. Is that fair? I have created the market as BOP Pizza… I've made a commitment over the long term. I've bought equipment. I've hired [staff] and now I've got patrons coming in my direction and they can be siphoned off by a food truck that's going to be gone in two hours. To me, that is not a satisfying outcome. And it doesn't strike me as fair competition and it very much strikes me as a free rider problem. That food truck is free riding upon the efforts of that pizzeria and in my mind policy makers shouldn't support that.

….

[O]ne economic actor is engaging in a certain level of investment or expenditure and I am able to free ride on those efforts without having to expend my own resources. And in that sense it's unfair because I'm being subsidized involuntarily by this other economic actor….

If I were a restauranteur or would[-]be restauranteur, … and I know that … a food truck … selling primarily the same item can locate right in front of my restaurant I may not open up the restaurant in the first place. Why would I spend … hundreds of thousands of dollars, take on all kinds of liability…. Why … spend that money just so a food truck that moves right in front of me can be successful for a few hours of the day before they move on to Baltimore County [or] wherever they're going to go? It doesn't make sense to me. That's the kind of thing … that produces commercial vacancies. That's the kind of thing that produces unemployment and we have enough of that in this City.

Mr. Basu opined that the 300-foot rule addresses this free rider problem, i.e., unfair competition between food trucks and brick-and-mortar restaurants, "very strongly":

My conclusion is very firmly that [the 300-foot rule] inures to the benefit of the people of Baltimore and to the benefit of the level of commercial transactions that will take place in this city over the long term[,] that it supports entrepreneurship[,] and that it supports street-level vitality.

The Food Trucks did not call an expert witness of their own in their case-in-chief or in

rebuttal following Mr. Basu's testimony.

During the Food Trucks' closing argument, the circuit court asked if the Food Trucks, in addition to arguing that the 300-foot rule violates substantive due process and equal protection, were also contending that the regulation was impermissibly vague because of "the ability to interpret [it] in different ways." The attorney for the Food Trucks at first seemed to suggest that the Food Trucks were advancing a vagueness challenge. However, as he went on in his answer, he did not assert that the 300-foot rule is void for vagueness. Rather, he restated the Food Trucks' claims regarding substantive due process and equal protection. After the City's counsel argued during his closing argument that the Food Trucks lacked standing to present an as-applied vagueness challenge and that a facial challenge on vagueness grounds would not have merit, the Food Trucks' attorney clarified during his rebuttal argument that "we didn't raise a void for vagueness challenge."

After the trial concluded, the circuit court took the case under advisement. On December 20, 2017, the court issued a Memorandum and Order. Applying "heightened rational basis" scrutiny, the court found that the 300-foot rule

> (1) protects the contributions brick-and-mortar retail establishments make to the City's commercial districts; (2) promotes entrepreneurial investments and opportunity by eliminating the potential risk of food trucks; and (3) diversifies the marketplace to maximize positive economic effect by creating meaningful choices for the consumer. The 300-foot rule promotes brick-and-mortar establishments throughout the City by eliminating the threat of mobile vendors, and ensuring brick-and-mortar establishments become a permanent fixture in the City. Promoting brick-and-mortar restaurants provides jobs, property tax revenue, and prevents a growing number of vacant properties. The commercial district of this City is dependent on these brick-and-mortar establishments' long-term real estate investments. The City's economic vitality is dependent upon the flourishment of its commercial district.

20

The court concluded that, because the 300-foot rule is substantially related to achievement of the City's legitimate purpose of ensuring the vibrancy of its commercial districts, the 300-foot rule does not infringe on the Food Trucks' substantive due process and equal protection rights.

However, despite the Food Trucks having disclaimed a vagueness challenge to the 300-foot rule, the circuit court held that the Rule is unconstitutionally vague in two ways. First, the court concluded that the phrases "primarily engaged in" and "same type of food product" deprive mobile vendors of fair notice of the rule's scope and how the City would enforce it. Second, the court found that "the entities enforcing this ordinance do not have guidance as to how to measure the 300-foot distance between brick-and-mortar establishments and food trucks." With respect to the latter problem, the circuit court construed § 17-33 to require that the 300-foot distance be measured "from the closest point of the space in the building that is occupied by the restaurant – or by the food court in which the restaurant is located (rather than at the closest point of the building in which the restaurant is located) to the closest point of the food truck." As to the former, the circuit court proffered no saving construction, and held that the lack of fair notice "prevents enforcement officials, brick-and-mortar restaurants, and food trucks from understanding what constitutes a violation of the rule." For that reason, the circuit court enjoined the City from enforcing the 300-foot rule. The circuit court's injunction went into effect on February 19, 2018.

Resolving the parties' cross-appeals, the Court of Special Appeals first held that the Food Trucks' substantive due process and equal protections claims were ripe. *Pizza di Joey,*

21

*LLC v. Mayor & City Council of Baltimore*, 241 Md. App. 139, 160-63 (2019). While the circuit court had found that at least one of the plaintiffs had "demonstrated sufficient facts" to show a "credible threat of prosecution," the intermediate appellate court rejected the City's ripeness challenge for a different reason. The Court of Special Appeals observed that "[a]lthough designated a misdemeanor, the 300-foot rule is, in substance and application, a local economic regulation. The primary injury the Food Trucks allege is not the possibility of prosecution, … but the loss of their right to pursue a business opportunity in their chosen profession, an interest that qualifies readily as a basis for a declaratory judgment." *Id.* at 162.

On the merits, the intermediate appellate court applied rational basis review to the 300-foot rule, and held that the Rule is rationally related to the legitimate government purpose of protecting brick-and-mortar establishments from free-riding mobile vendors. Thus, the Court of Special Appeals agreed with the circuit court's determination that the 300-foot rule does not violate the Food Trucks' rights to substantive due process and equal protection under Article 24. *Id.* at 163-78. However, the court reversed the circuit court's grant of injunctive relief, concluding that the Food Trucks did not preserve a vagueness challenge for appellate review and, even if they did, the 300-foot Rule is not impermissibly vague. *Id.* at 178-82.

The Food Trucks sought certiorari in this Court. On September 9, 2019, we granted the Food Trucks' petition. 466 Md. 192 (2019).

**Standard of Review**

Where, as here, "an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8-131(c); *see Sapero v. Mayor & City Council of Baltimore*, 398 Md. 317, 333-34 (2007). We review the trial court's legal conclusions without any deference. *Id.* at 334. The proper scope of a constitutional right, and its application to a particular set of facts, are issues of law. *See State v. Cates*, 417 Md. 678, 691 (2011); *Glover v. State*, 368 Md. 211, 220-21 (2002). Therefore, we review such questions *de novo*. *Schisler v. State*, 394 Md. 519, 535 (2006).

**III**

**Discussion**

**A. The Food Trucks' Substantive Due Process and Equal Protection Claims Are Justiciable.**

Before we address the constitutionality of the 300-foot rule, we consider the City's argument that the Food Trucks' substantive due process and equal protection claims are not justiciable under the declaratory judgment act. In the courts below, the City argued that those claims were not sufficiently ripe to present an actual controversy. The circuit court and the Court of Special Appeals rejected the City's ripeness challenge, although for different reasons. We, too, shall hold that the Food Trucks' substantive due process and equal protection claims are justiciable.

The declaratory judgment act provides that "a court may grant a declaratory judgment or decree in a civil case, if it will serve to terminate the uncertainty or controversy giving rise to the proceedings, and if … [a]n actual controversy exists between contending parties." Md. Code, Cts. & Jud. Proc. § 3-409(a)(1) (1973, 2013 Repl. Vol.). A court cannot consider a declaratory judgment action unless the underlying controversy is justiciable. *State Center, LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 591 (2014); *Hatt v. Anderson*, 297 Md. 42, 45 (1983) ("[T]he existence of a justiciable controversy is an absolute prerequisite to the maintenance of a declaratory judgment action."). A case is not justiciable if it is not "ripe" for review. *See State Center*, 438 Md. at 591. A claim for declaratory relief "lacks ripeness if it involves a request that the court declare the rights of parties upon a state of facts which has not yet arisen, or upon a matter which is future, contingent and uncertain." *Id.* The purpose of the declaratory judgment act is not to "decide theoretical questions or questions that may never arise, or questions which have become moot, or merely abstract questions…. To address issues which are non-justiciable because they are not ripe would place courts in the position of rendering purely advisory opinions, a long forbidden practice in this State." *Hickory Point P'ship v. Anne Arundel Cty.*, 316 Md. 118, 129-30 (1989); *see also State v. G & C Gulf, Inc.*, 442 Md. 716, 718-19 (2015).

In its motion for summary judgment and before the Court of Special Appeals, the City argued that, because neither Pizza di Joey nor Madame BBQ has been prosecuted or cited (or threatened with such prosecution or citation) for violating the 300-foot rule, the Food Trucks' challenge to the Rule only "exists in the abstract" and therefore is not ripe. Thus, the City argued, the circuit court should have dismissed this case.

24

The Court of Special Appeals recognized that neither Pizza di Joey nor Madame BBQ faced imminent prosecution when they filed their action for a declaration that the 300-foot rule is unconstitutional. However, the Court of Special Appeals observed:

> [I]f the Food Trucks' only opportunity to challenge the 300-foot rule's constitutionality arises when they are issued a citation, that opportunity is unlikely ever to arise because the City and its enforcement agencies do not enforce the 300-foot rule by pursuing any of the penal consequences authorized by the Baltimore City Code. Violations of the 300-foot rule are misdemeanors, but the rule doesn't operate like a typical penal statute.
>
> ….
>
> Although designated a misdemeanor, the 300-foot rule is, in substance and application, a local economic regulation. The primary injury the Food Trucks allege is not the possibility of prosecution, … but the loss of their right to pursue a business opportunity in their chosen profession, an interest that qualifies readily as a basis for a declaratory judgment.

*Pizza di Joey*, 242 Md. App. at 162; *see also Oyarzo v. Maryland Dep't of Health & Mental Hygiene*, 187 Md. App. 264, 275 (2009) ("[T]he right [the plaintiff] seeks to protect is the right to pursue a business opportunity. He asserts that the challenged regulation restricts his right to pursue his chosen profession…. This is not a case in which the event triggering the controversy is remote and contingent. There is no need for [the plaintiff] to violate the challenged regulation in order for us to consider whether it was within the scope of the Department's authority to adopt [the regulation].").

The intermediate appellate court further explained that the Food Trucks are "indisputably limited in their business" because the 300-foot rule "restricts where they can sell and affects their potential profitability." *Pizza di Joey*, 241 Md. App. at 162-63. Rejecting the City's description of the Food Trucks' claims as purely abstract and

25

theoretical, the Court of Special Appeals observed that the controversy's "contours are visible: the 300-foot rule requires mobile vendors to keep their distance from direct brick-and-mortar competitors, in ways we can measure and draw on maps (as the parties have)." *Id.* at 163. Thus, the court held that the Food Trucks' claims are "sufficiently 'concrete and specific' to generate a controversy that is ripe for review." *Id.* (quoting *Hatt*, 297 Md. at 46). We agree with the Court of Special Appeals' analysis concerning ripeness in this case.[8]

Implicitly recognizing the soundness of the Court of Special Appeals' holding on ripeness, the City has shifted the focus of its justiciability argument in this Court. The City now contends that the Food Trucks have not made a sufficient showing that they have suffered a specific, quantifiable, negative financial impact as a result of the Rule, such that they may challenge its constitutionality. Indeed, the City observes that "business apparently has been quite good for Pizza di Joey," given that, in 2019, Mr. Vanoni was able to open a brick-and-mortar location in the City's newly renovated Cross Street Market in Federal Hill.[9]

---

[8] Contrary to the Dissent's concern, we continue to require that courts decide actual cases and controversies, not abstract or hypothetical cases. However, the mere presence of a criminal penalty for violations of the Ordinance does not render the Food Trucks' substantive due process and equal protection claims abstract. The record reflects that the City actively enforces the 300-foot rule, but not by charging any mobile vendors under the Rule's criminal penalty provision, or even by citing them civilly or seeking license suspension or revocation. Rather, the City enforces compliance with the Rule by asking mobile vendors to move after a nearby restaurant complains. The City may not insulate the 300-foot rule from constitutional challenge by pointing to a criminal penalty that it chooses not to use, while simultaneously enforcing compliance with the Rule through other means.

[9] The record does not tell us how the Madame BBQ food truck fared in Howard County while Ms. McGowan operated it there.

The City's current argument is less about ripeness and more about the standing of these particular plaintiffs to seek relief. While the doctrines of standing and ripeness both "fall under the umbrella of justiciability," *G & C Gulf*, 442 Md. at 696 n.2 (internal quotation marks and citation omitted), they are distinct. *See id.*; *State Center*, 438 Md. at 498. Standing "refers to whether the plaintiff has shown that he or she is entitled to invoke the judicial process in a particular instance," *id.* at 502 (cleaned up); whereas a question of ripeness "arises if parties, entitled to invoke the judicial process, ask the court to declare their rights upon a state of facts which has not yet arisen, or upon a matter which is future, contingent and uncertain." *G & C Gulf*, 442 Md. at 696 n.2 (cleaned up). The requirement of standing "is designed to ensure that a party seeking relief has a sufficiently cognizable stake in the outcome so as to present a court with a dispute that is capable of judicial resolution." *Kendall v. Howard Cty.*, 431 Md. 590, 603 (2013) (internal quotation marks and citations omitted). "Under Maryland common law, standing to bring a judicial action generally depends on whether one is aggrieved, which means whether a plaintiff has an interest such that he or she is personally and specifically affected in a way different from the public generally." *Id.* (cleaned up); *see also Evans v. State*, 396 Md. 256, 328 (2006) ("[A]n individual or an organization has no standing in court unless he has also suffered some kind of special damage from such wrong differing in character and kind from that suffered by the general public.") (cleaned up); *Davis v. State*, 183 Md. 385, 389 (1944) (allowing pre-enforcement declaratory judgment challenge to Maryland statute prohibiting medical doctors from advertising their services, where plaintiff doctor was "directly affected" by the statute; doctor was "entitled to apply for a declaratory judgment … rather

27

than run the risk of being subjected to criminal prosecution, and possibly having his license revoked"); *cf. United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973) (explaining that the purpose of the analogous federal law standing requirement of "injury-in-fact" is "to distinguish a person with a direct stake in the outcome of a litigation – even though small – from a person with a mere interest in the problem").

We disagree with the City's contention that the Food Trucks lack standing to challenge the 300-foot rule. The Food Trucks sufficiently established that they are aggrieved by the 300-foot rule. Unlike members of the general public, who might be disappointed that the 300-foot rule results in their having fewer food options in Federal Hill, Hampden, and other City neighborhoods, the Food Trucks are personally and specifically affected by the Rule in a way that the general public is not. The Food Trucks both applied for and received mobile vendor licenses. Thus, they both paid fees for the privilege to operate in the City. Mr. Vanoni and Ms. McGowan both testified without contradiction that, but for the 300-foot rule, they would have focused their mobile vending businesses in various specific commercial districts in the City, including Federal Hill and Hampden.[10] In other words, the Food Trucks specifically altered their business plans as a result of the 300-foot rule. We are also satisfied by our review of the record that, but for the Rule, Pizza di Joey and Madame BBQ both would have received substantial revenues

---

[10] Notably, both Mr. Vanoni and Ms. McGowan operate other food-related ventures in Baltimore City. As discussed above, Mr. Vanoni now operates a brick-and-mortar Pizza di Joey restaurant in Federal Hill. And Ms. McGowan owns a commissary in Locust Point.

28

from operating in Hampden and Federal Hill. In addition, we can infer from the record that Mr. Vanoni, a resident of the City, incurred greater fuel expenses by driving to and from Anne Arundel County to operate his truck than he would have if he had been able to operate his truck closer to home in the Federal Hill or Hampden neighborhoods of the City. Given these concrete and particularized effects of the 300-foot rule on the Food Trucks, we conclude that the Food Trucks have standing to challenge the Rule's constitutionality.[11]

In sum, we are satisfied that the Food Trucks have stated justiciable substantive due process and equal protection claims. Thus, we will consider those claims on their merits.

## B. The 300-foot Rule Does Not Violate the Food Trucks' Rights to Substantive Due Process and Equal Protection Under Article 24.

The Food Trucks argue that the Court of Special Appeals erred in applying rational basis review to their substantive due process and equal protection claims under Article 24. According to the Food Trucks, the proper test when determining the constitutionality of

---

[11] As the City points out, in some cases in which this Court has found that plaintiffs had standing to bring pre-enforcement challenges of statutes covering their conduct, those plaintiffs alleged, or it was undisputed, that their compliance with the statutes had reduced their income significantly. *See Bruce v. Director, Dep't of Chesapeake Bay Affairs*, 261 Md. 585, 588, 591, 595 (1971) (undisputed that territorial restrictions on crabbing and oystering had a severe economic impact on plaintiff watermen); *Davis*, 183 Md. at 387-89 (doctor alleged that, after he complied with statute prohibiting advertising, his revenues fell more than 50 percent from previous years when he did advertise). But causing a loss of net income is not the only way that an economic regulation can concretely affect a business to its detriment. A regulation can, as here, cause a business to change its business plan out of fear that compliance may result in prosecution or the loss of a license. Moreover, loss of net income is not the only financial harm that can satisfy the requirement of standing. If, as here, a business alleges the loss of a particular source of revenue as a result of an economic regulation, the fact that the business may be able to partially or even completely replace that revenue by operating in a different jurisdiction is immaterial to the standing analysis.

29

legislation that burdens a person's ability to practice a lawful trade is heightened rational basis review. The Food Trucks contend that, if we apply that more rigorous test to the 300-foot rule, we must find that it violates their rights to substantive due process and equal protection under Article 24. Alternatively, the Food Trucks argue that the 300-foot rule is unconstitutional even under the more deferential rational basis test.

The City asserts that we should review the 300-foot rule under the more deferential rational basis standard, and that the Court of Special Appeals correctly held that the Rule passes constitutional muster under that test. The City alternatively argues that, if we apply heightened rational basis review (as did the circuit court), the result remains that the 300-foot rule does not violate the Food Trucks' rights to substantive due process and equal protection under Article 24. We agree with the City in all respects.

1. Rational Basis Review Is Appropriate for This Case.

Article 24 provides "[t]hat no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the Land." This provision of the Declaration of Rights guarantees due process and equal protection of the laws to the people of Maryland.[12]

When a statute creates a distinction based upon "clearly suspect" criteria (such as race, gender, religion, or national origin), or when it infringes on a "fundamental" right,

---

[12] Although Article 24 is titled "Due process" and does not expressly address equal protection of the laws, it is well settled that "the concept of equal protection nevertheless is embodied in the Article." *Renko v. McLean*, 346 Md. 464, 482 (1997); *see also* Dan Friedman, *The Maryland State Constitution* 59-60 (2011).

we apply strict scrutiny when considering a substantive due process or equal protection challenge to it. *See, e.g.*, *Powell v. Maryland Dep't of Health*, 455 Md. 520, 548 (2017); *State v. Burning Tree Club, Inc.*, 315 Md. 254, 296 (1989); *Murphy v. Edmonds*, 325 Md. 342, 356 (1992). We will invalidate a statute that is subject to strict scrutiny unless it "is necessary to promote a compelling governmental interest." *Conaway v. Deane*, 401 Md. 219, 272-73 (2007), *abrogated on other grounds by Obergefell v. Hodges*, 135 S. Ct. 2584 (2015). Because such statutes must be the least restrictive means available to accomplish the compelling governmental interest, they "rarely survive the legal glare." *Id.* at 273.

On the other end of the spectrum are statutes that do not discriminate on the basis of an inherently suspect classification and do not burden any fundamental constitutional right. We assess whether such a statute is "rationally related to a legitimate governmental interest." *Id.* at 274 (internal quotation marks and citation omitted). Rational basis review is "the least exacting and most deferential standard of constitutional review." *Id.* at 273-74. Under this standard, we presume that the challenged statute is constitutional, and will uphold it "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [we] can only conclude that the [State's] actions were irrational." *Murphy*, 325 Md. at 355 (internal quotation marks and citations omitted). Put another way, we will uphold a statute under this form of review if there is "any reasonably conceivable state of facts that could provide a rational basis for the classification." *Washington v. State*, 450 Md. 319, 344 (2016) (internal quotation marks and citation omitted).

Between these poles are statutes that burden "important personal rights, not yet held to merit strict scrutiny but deserving of more protection than a perfunctory review would accord." *Murphy*, 325 Md. at 382 (quoting *Attorney Gen. of Md. v. Waldron*, 289 Md. 683, 713 (1981)). Our prior cases suggest that these statutes in the middle can, themselves, be divided into two groups that receive different levels of review. First, when a statute makes a distinction based on a "quasi-suspect" classification, such as illegitimacy, a court reviews the statute under what the Supreme Court and this Court have referred to as "intermediate scrutiny." *See Conaway*, 401 Md. at 275-76. To withstand this level of review, a statute must "serve important governmental objectives and must be substantially related to the achievement of those objectives." *Id.* at 276 (internal quotation marks and citations omitted).

Second, an economic regulation that prohibits an individual from practicing his or her chosen trade, or that, on its face, discriminates based on a factor that is unrelated to the stated purpose of the regulation, is reviewed under a "heightened rational basis" test. *See Waldron*, 289 Md. at 728; *Verzi v. Baltimore County*, 333 Md. 411, 419 (1994). When such an economic regulation is reviewed under Article 24, courts will not accept "any reasonably conceivable state of facts that could provide a rational basis" for the challenged legislation, *Washington*, 450 Md. at 344, but rather will consider only "those purposes that are obvious from the text or legislative history of the enactment, those plausibly identified by the litigants, or those provided by some other authoritative source." *Waldron*, 289 Md. at 722. To survive heightened rational basis review, the statute in question must bear "a real and substantial relation to the problem addressed by the statute." *Id.* at 728.

32

As the Court of Special Appeals explained, *see Pizza di Joey*, 241 Md. App. at 168, the "real and substantial relation" language also appeared in some of this Court's decisions in the early years of the twentieth century concerning substantive due process. During this period, sometimes referred to as the "*Lochner* era," after *Lochner v. New York*, 198 U.S. 45 (1905), the Supreme Court invalidated a number of federal and state statutes that sought to regulate economic conditions. The Supreme Court was skeptical during that era of legislative enactments that interfered with the right to contract. So was this Court, which stated that "[t]he legislative authority to abridge [freedom of contract] can be justified only by exceptional circumstances. The guarantee of due process simply demands that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained." *Daniel Loughran Co. v. Lord Baltimore Candy & Tobacco Co.*, 178 Md. 38, 44 (1940) (internal quotation marks and citations omitted). As the Court of Special Appeals observed, *Pizza di Joey*, 241 Md. App. at 170-71, we abandoned this line of "real and substantial relation" cases in 1977, when we decided *Governor of Md. v. Exxon*, 279 Md. 410 (1977), and applied the more deferential form of rational basis review to an economic regulation. In that case, we explained that we had

> returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws…. Legislative bodies have broad scope to experiment with economic problems…. We refuse to sit as a superlegislature to weigh the wisdom of legislation…. [I]t is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it.

*Id.* at 425-26 (internal quotation marks and citations omitted).

33

We disagree with the Food Trucks' contention that *Exxon* is a "constitutional outlier." We reaffirm that, under Article 24, an economic regulation that does not affect an important personal right at all is reviewed under the rational basis test. In contrast, a statute that entirely prohibits a person from practicing a trade receives heightened rational basis scrutiny under the "real and substantial relation" test. A statute that places some constraints on the time and place where a person can practice a trade, but does not entirely prevent the person from pursuing that trade (and does not discriminate based on geography or another suspect classification that suggests the proffered legitimate governmental interest is pretextual), is reviewed under the rational basis test.[13]

The parties disagree about whether the 300-foot rule is properly reviewed under the rational basis test or under the heightened rational basis test. Although it is a close question, we conclude that the appropriate level of scrutiny here is review under the rational basis test.

---

[13] We are unpersuaded by the Food Trucks' attempt to read Article 24's "Law of the land" language as compelling heightened rational basis scrutiny for every alleged substantive due process violation involving the practice of a trade or business. In this regard, the Food Trucks distinguish Article 24 from the due process clauses of the Fifth and Fourteenth Amendments of the U.S. Constitution, which do not contain references to the "Law of the land." But, as we have previously recognized, "[t]he term 'Law of the land,' derived from the Magna Carta, is generally considered to be synonymous with the term 'due process of the law' as used in the Fifth and Fourteenth Amendments." *Sapero*, 398 Md. at 344. To the extent our jurisprudence is in keeping with that of the federal courts and has diverged from that of a few states which seemingly still adhere to decisions from the *Lochner* era, *see, e.g.*, *Ladd v. Real Estate Comm'n*, 230 A.3d 1096, 2020 WL 2532285 (Pa. May 19, 2020); *see also id.* at *15-*16 (Wecht, J., dissenting) (criticizing *Ladd* Majority for hewing to *Lochner*, which "jumpstarted an era of judicial overreach"), we reaffirm our belief that rational basis review furthers the democratic process by appropriately requiring judicial restraint when reviewing most economic regulations.

The Food Trucks argue that we must subject the 300-foot rule to heightened rational basis review, citing *Waldron* and *Verzi*. But the legislative enactments at issue in those cases differed significantly from the 300-foot rule.

In *Waldron*, the Attorney General sought a declaration upholding the constitutionality of a statute that prohibited retired judges from practicing law for profit if they accepted State-provided pensions. *See Waldron*, 289 Md. at 686-87. Because the statute was not "an economic regulation of lawyers," but rather "flatly denie[d] [a retired judge] the right to engage in the practice of the profession for which he [or she was] otherwise qualified," *id.* at 717, this Court applied heightened rational basis review. *See id.*

Here, the 300-foot rule does not effectively deny Pizza di Joey, Madame BBQ, and other City-licensed mobile vendors from pursuing their chosen vocation. Rather, it regulates the places where they may do so within the City. It is undisputed that the Ordinance provides other locations in the City where mobile vendors may operate. And, if mobile vendors are not satisfied with those locations and the other locations where they are permitted to park in the City, they may pursue their chosen vocation across the City line, as Pizza di Joey and Madame BBQ did. The statute at issue in *Waldron* provided retired judges with no such opportunity; it was a blanket prohibition on their ability to practice law in the State for profit.

In *Verzi*, this Court invalidated a Baltimore County regulation that required a licensed towing operator to have a place of business within the county before police could call the operator to tow a vehicle that had been disabled by an accident. 333 Md. at 413. We explained that, when we assess the constitutionality of a "legislative classification[]

35

which impinge[s] on privileges cherished by our citizens, … [we] require[] that [such] a legislative classification rest upon some ground of difference having a fair and substantial relation to the object of the legislation." *Id.* at 419 (internal quotation marks and citations omitted). But the factor that animated the level of scrutiny we chose to apply to Baltimore County's towing regulation was not that it affected a business at all, but rather that it did so based on a geographical distinction. *See id.* at 423 (observing that the Court "has been particularly distrustful of classifications which are based solely on geography, i.e., treating residents of one county or city differently from residents of the remainder of the State"). That is because the distinction based on geography, on its face, gave rise to concern that the intent of the regulation was to discriminate between in-county and out-of-county businesses, rather than regulate how towing companies operated. *See id.* at 427.

Here, there is no similar geographical classification at work in the City's 300-foot rule. As the Court of Special Appeals aptly observed, *Verzi* would be analogous to this case if the City conditioned mobile vendor licenses on City residence. *Pizza di Joey*, 241 Md. App. at 174. But it does not. Rather, the 300-foot rule "regulates the places *all* City-licensed mobile vendors can operate in Baltimore City, wherever those food trucks are parked at idle." *Id.*

We conclude from our examination of *Waldron* and *Verzi* that the 300-foot rule is properly reviewed under the more deferential rational basis standard. Contrary to the Food Trucks' contention, these cases do not stand for the proposition that Article 24 requires heightened rational basis scrutiny for all statutes that impose any kind of regulation on a business. The regulation must either effectively deny a class of business operators the

36

ability to practice their trade entirely, or it must discriminate against a class of business operators based on a factor (such as geography) that has nothing to do with the nature of the business, in order to trigger heightened rational basis scrutiny. The 300-foot rule does neither. Accordingly, we apply rational basis review to the 300-foot rule.

2. The 300-foot Rule Is Rationally Related to a Legitimate Government Interest.

As explained above, the rational basis test requires us to consider whether the 300-foot rule is rationally related to a legitimate government interest. *Conaway*, 401 Md. at 274. We agree with the Court of Special Appeals that "the 300-foot rule rationally furthers the City's legitimate interest in addressing the free-rider problem that arises when mobile vendors set up within a block of direct brick-and-mortar competitors." *Pizza di Joey*, 241 Md. App. at 176.

When we review a legislative enactment under the rational basis test, we do not substitute our judgment for that of the legislative body. *See, e.g.*, *Exxon*, 279 Md. at 425-26; *Tyler v. City of College Park*, 415 Md. 475, 500-01 (2010); *Salisbury Beauty Schools v. State Bd. of Cosmetologists*, 268 Md. 32, 48 (1973). Rather, we recognize that the "Legislature exercises a large discretion in determining what the public welfare requires, in what may be injurious to the general welfare of the public and also what measures are either necessary or appropriate for the protection and promotion of these interests." *Id.* This is particularly the case when the legislative body is "dealing with a serious problem in a new and untried fashion"; in such cases, "courts are under a special duty to respect the legislative judgment as to the proper means of solving the problem." *Exxon*, 279 Md. at 428; *see also Tyler*, 415 Md. at 500 (noting that "courts are under a special duty to respect

37

the legislative judgment where the legislature is attempting to solve a serious problem in a manner which has not had an opportunity to prove its worth").

For these reasons, legislative decisions like the 300-foot rule carry a strong presumption of constitutionality, "despite the fact that, in practice, [its] laws result in some inequality." *Supermarkets Gen. Corp. v. State*, 286 Md. 611, 617 (1979) (internal quotation marks and citation omitted). Therefore, we will not invalidate the 300-foot rule unless the City misused or abused its legislative authority, or acted arbitrarily, oppressively or unreasonably in enacting the Rule. *See Salisbury Beauty Schools*, 268 Md. at 48-49.

The Food Trucks argue that the City misused and abused its legislative authority by infringing on the practice of their trade in order to enrich existing brick-and-mortar restaurants. According to the Food Trucks, the City's protectionist goals in enacting the 300-foot rule, by definition, do not constitute a legitimate government interest. We disagree.

The City established at trial that protecting brick-and-mortar restaurants through the 300-foot rule is not an end in itself, but rather is a means to an end: maintaining vibrant commercial districts. The creation and retention of vibrant commercial neighborhoods surely is a legitimate interest that the City may seek to achieve through the enactment of ordinances. That the means it has chosen to do so in this instance reduces the competition brick-and-mortar restaurants face from mobile vendors does not render the 300-foot rule unconstitutional. To the contrary, our cases demonstrate that, in furtherance of the general welfare, legislative bodies may limit competition as long they do not impermissibly discriminate based on a suspect classification or otherwise make arbitrary and capricious

38

distinctions that do not further the general welfare of the community. *See Salisbury Beauty Schools*, 268 Md. at 56 ("That [a] statute may undertake indirectly to control prices and affect competition does not per se render it invidious or unconstitutional; such a form of regulation is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the Legislature is free to adopt."); *see also Blum v. Engelman*, 190 Md. 109, 115 (1948) (lawmakers are "free to adopt whatever economic policy may reasonably be deemed to promote public welfare, whether by promoting free competition by statutes aimed at monopolies or by curbing harmful competition by fixing minimum prices").

The Food Trucks' reliance on *Verzi* in this regard again is misplaced. In that case, the Court discerned that the proffered justifications for the County regulation – such as decreasing traffic congestion and delays in the roadways – were pretextual. 333 Md. at 425-27. In reality, we concluded, the regulation sought to discriminate against non-Baltimore County towing companies to the benefit of in-county towing companies. *Id.* at 427. Here, based on Mr. Basu's testimony, the circuit court found that the City's goal in enacting the 300-foot rule is to promote the general welfare by ensuring the vibrancy of the City's commercial districts. The Food Trucks point to no evidence in the record that contradicts this finding, and the circuit court did not clearly err in reaching this conclusion.

Nor do the Food Trucks seriously dispute that the 300-foot rule rationally furthers this legislative goal. The circuit court found that the Rule helps maintain the vitality of the City's commercial districts by eliminating the threat that mobile vendors pose to brick-and-mortar restaurants and, therefore, helping to ensure that restaurants become permanent fixtures in their neighborhoods. This, in turn, "provides jobs, property tax revenue, and

prevents a growing number of vacant properties." The court also determined that the 300-foot rule "protects the contributions brick-and-mortar establishments make to the City's commercial districts," "promotes entrepreneurial investments and opportunity," and "diversifies the marketplace to maximize positive economic effect by creating meaningful choices for the consumer." The Food Trucks do not challenge these factual findings, and even if they did, such a challenge would fail. The circuit court's findings are amply supported by Mr. Basu's testimony.

As noted at the outset, local governments routinely must balance competing interests to promote the general welfare. This requires that cities such as Baltimore sometimes make difficult choices that help some businesses and hurt others. While the Food Trucks discern no cost to the City in allowing the free market to decide, without any interference, how mobile vendors would affect nearby restaurants, the City's lawmakers reasonably could have seen it otherwise. They reasonably could have concluded that, just as a "free lunch" often turns out not actually to be free,[14] there would be a cost to the

---

[14] The adage "there ain't no such thing as a free lunch" has been traced back to the Depression era, but the concept's roots apparently lie in the practice of nineteenth-century saloons to provide a "free lunch" to customers who purchased alcoholic beverages. *See* Alexandra Twin, *There Ain't No Such Thing As a Free Lunch (TANSTAAFL)*, available at https://www.investopedia.com/terms/t/tanstaafl.asp (accessed on July 13, 2020), archived at https://perma.cc/L3GE-CLWM. The idea was that the high salt content in the food would cause the customers to purchase more drinks, thereby offsetting the cost of the food to the saloon. *Id.* In economics, TANSTAAFL describes the concept of opportunity cost, which recognizes that "for every choice made, there is an alternative not chosen." *Id.* In other words, "[d]ecision-making requires trade-offs and assumes that there are no real free offerings in society." *Id.*; *see also* N. Gregory Mankiw, *Principles of Economics* 4 (8th ed. 2015) ("To get something that we like, we usually have to give up something else that we also like."). Or, as Robert Heinlein had a character explain in his 1966 classic science fiction novel, TANSTAAFL means that "anything free costs twice as much in [the] long

40

purported "free lunch" of unregulated competition that the Food Trucks offer here: mobile vendors would siphon business from brick-and-mortar restaurants and harm the economic vitality and, ultimately, the general welfare of the City. It was within the City's authority to enact an economic regulation designed to address the "free rider" problem Mr. Basu described. And the City did so in the context of a robust regulatory regime that also allows mobile vendors to operate in specific dedicated zones, as well as in other locations that are not within 300 feet of directly competing brick-and-mortar restaurants. While the Food Trucks claim this balancing of interests infringes on their rights to substantive due process and equal protection, we see it simply as democracy in action.

Our conclusion is in keeping with the decision of the Supreme Court of Illinois in *LMP Services, Inc. v. City of Chicago*, __ N.E.3d __, 2019 IL 123123, ¶ 20 (Ill. May 23, 2019), upholding Chicago's analogous ordinance that prohibits food trucks from parking within 200 feet of the entrance of a ground-floor restaurant. The *LMP* Court held:

> [Chicago] has a legitimate governmental interest in encouraging the long-term stability and economic growth of its neighborhoods. The 200-foot rule, which helps promote brick-and-mortar restaurants and, thus, neighborhood stability, is rationally related to this legitimate interest. Importantly, too, in 2012, when the City passed Ordinance 2012-4489, section 7-38-117 was added to the Code. This section created a number of food truck stands, *i.e.*, designated areas along the public way where food trucks are permitted to park without being subject to the 200-foot rule. Thus, the City has not entirely banned food trucks. Rather, it has created a regulatory scheme that attempts to balance the interests of food trucks with the need to promote neighborhood stability that is furthered by brick-and-mortar restaurants.

*Id.* So too here.

---

run or turns out worthless." Robert A. Heinlein, *The Moon Is a Harsh Mistress* 162 (Tom Doherty Associates 1997 ed.).

41

In sum, the 300-foot rule's restriction on the locations where the Food Trucks may operate are not arbitrary, oppressive, or unreasonable. To the contrary, the Rule directly furthers the City's conception of what is necessary for its general welfare.

As was the case with the Court of Special Appeals, "[w]e offer no views on the wisdom or the economic efficacy of the 300-foot rule. Our role is not to screen for bad policy, but for unconstitutional legislation." *Pizza di Joey*, 241 Md. App. at 178.[15] Because the 300-foot rule is rationally related to the City's legitimate interest in maintaining the vibrancy of its commercial districts, the Rule passes muster under the substantive due process and equal protection components of Article 24.

3. The 300-foot Rule Also Survives Heightened Rational Basis Review.

Even if we assume that the right to operate as a mobile vendor without any restriction based on the location of competing brick-and-mortar restaurants is an important personal right that warrants heightened rational basis review, we conclude that the 300-foot rule is constitutional under that standard as well. For the same reasons as discussed above, we conclude that the reason proffered by the City for the Rule – the need to address

---

[15] At oral argument, the Food Trucks several times referred to the *amicus curiae* brief filed by three economics professors in arguing that Mr. Basu's free rider analysis is flawed. See Brief of *Amicus Curiae* Economics Professors in Support of Petitioners 11-16 (arguing, among other things, that food trucks respond to demand, not to restaurants, and that they create new customers, rather than siphon existing customers from brick-and-mortar establishments). But the *amicus* professors did not testify at the trial in this case. The only expert testimony the circuit court had to consider was Mr. Basu's. Moreover, the professors' analysis is better directed to the City in its legislative capacity than to us. It is for the City to decide whether its current balance of interests furthers its legitimate interests in the best way possible. The City is free to change course and repeal or amend the 300-foot rule if it concludes that the Rule is not producing the benefits the City expected, or if the City perceives that the Rule's costs outweigh the benefits it provides.

the free rider problem posed by mobile vendors – bears a "real and substantial relation" to the legitimate interest the City has in ensuring the vibrancy of its commercial districts and, thereby, promoting the general welfare.

## C. The 300-foot Rule Is Not Impermissibly Vague.

Although the Food Trucks expressly told the circuit court that they had not made a void-for-vagueness claim, the court concluded on its own initiative that the 300-foot rule is impermissibly vague and therefore enjoined the City from enforcing it. The court reasoned that the phrases "primarily engaged in" and "same type" (of food product), which are not defined in the Ordinance, deprive mobile vendors of fair notice of the Rule's scope and how the City would enforce it.[16] The Court of Special Appeals reversed, holding that the Food Trucks had not preserved a vagueness challenge for appellate review. Alternatively, the intermediate appellate court held that the Food Trucks could not assert either an as-applied or facial vagueness claim, but even if they could bring either such claim, the 300-foot rule is not impermissibly vague.

The Food Trucks affirmatively waived a void-for-vagueness challenge in the circuit court. We therefore hold the circuit court erred when it raised a vagueness challenge to the 300-foot rule on its own initiative, determined that the Rule is void for vagueness, and

---

[16] As discussed above, the circuit court construed the Rule's 300-foot distance to be measured "from the closest point of the space in the building that is occupied by the restaurant – or by the food court in which the restaurant is located (rather than at the closest point of the building in which the restaurant is located) to the closest point of the food truck." Neither side challenged this construction of the Rule in the Court of Special Appeals, nor has any party asked us to review it. Thus, the circuit court's measurement construction is not before us.

enjoined the City from enforcing the Rule on that basis. Reviewing the merits of the circuit court's grant of injunctive relief, we agree with the Court of Special Appeals that the 300-foot rule is not impermissibly vague on its face.

1. <u>The Circuit Court Erred by Raising and Deciding a Vagueness Challenge to the 300-foot Rule on Its Own Initiative.</u>

The City contends that we should not address the merits of the Food Trucks' vagueness argument on appeal because the Food Trucks waived a vagueness claim in the circuit court. The record indeed reflects that the Food Trucks affirmatively waived a void-for-vagueness challenge to the 300-foot rule when, during the summary judgment hearing and again during closing arguments, they expressly stated that they had not made a vagueness claim.

It was error for the circuit court to invalidate the 300-foot rule based on a claim that the Food Trucks affirmatively waived. Just as a trial court generally lacks authority *sua sponte* to assert an affirmative defense on behalf of a party that has affirmatively waived it, *see, e.g.*, *Kapar v. Kuwait Airways Corp.*, 845 F.2d 1100, 1105 (D.C. Cir. 1988) (reversing *sua sponte* dismissal of case for lack of personal jurisdiction, where defendant had voluntarily withdrawn its motion for dismissal on that ground), a trial court should not, on its own initiative, decide a claim for relief that a party has not raised, let alone affirmatively waived. *See Commonwealth v. Morales*, 622 Pa. 352, 355-56 (2013) (holding that trial court erred when it *sua sponte* struck down Pennsylvania's Drug-Free School Zones as unconstitutional after criminal defendant had waived a potential claim on that ground); *cf. Steiner v. Markel*, 600 Pa. 515, 522 (2009) (issue whether Complaint contained

44

a claim for breach of contract was waived, and intermediate appellate court therefore should not have raised it *sua sponte*). This is especially the case where the trial court, on its own initiative, determines that a statute is unconstitutional based on a claim that a party in the case has affirmatively waived.

Because the circuit court ruled on its own initiative that the 300-foot rule is void for vagueness, we may reach the merits of this question. *See* Md. Rule 8-131(a) (providing that, except as to jurisdictional questions, "[o]rdinarily, the appellate court will not decide [an] issue unless it plainly appears by the record to have been raised in *or decided* by the trial court") (emphasis added). However, where, as here, a party affirmatively waived relief based on a claim that the trial court subsequently adopted on its own initiative, we also have discretion *not* to consider the party's appellate defense of the trial court's *sua sponte* ruling. That is, the decision by a trial court to raise and adopt a claim (or an affirmative defense) in favor of a party *sua sponte*, despite the waiver of that claim or defense by the party, does not compel an appellate court to ignore the party's waiver. Our adversarial system of justice relies on the parties themselves to decide which claims and defenses they wish to raise. When a trial court on its own initiative ignores a party's affirmative waiver, the court puts its thumb on the scale in a way that, ordinarily, is improper. Thus, we have discretion to give effect to the Food Trucks' affirmative waiver of a void-for-vagueness claim and not review the circuit court's *sua sponte* vagueness ruling. However, because the question of the 300-foot rule's vagueness is one of substantial importance, and because the Court of Special Appeals chose to decide that question, we will also reach the merits of the circuit court's vagueness ruling.

45

2. The 300-foot Rule Is Not Void for Vagueness.

The void-for-vagueness doctrine "is rooted in the fourteenth amendment's guarantee of procedural due process." *Galloway v. State*, 365 Md. 599, 611 n.7 (2001) (quoting *Williams v. State,* 329 Md. 1, 8 (1992) (internal quotation marks omitted)); *see also Eanes v. State*, 318 Md. 436, 459 (1990) (discussing how vagueness standards are "based on fourteenth amendment due process or fairness concerns"). "A law is not vague simply because it requires conformity to an imprecise normative standard." *Id.* Because "[t]he root of the vagueness doctrine is a rough idea of fairness," the "touchstone" of a vagueness analysis is "whether persons of common intelligence must necessarily guess at [the law's] meaning and differ as to its application." *Id.* (cleaned up). This applies to both those who are subject to the statute and those who are charged with its enforcement. Thus, a statute must be "sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties." *Bowers v. State*, 283 Md. 115, 120 (1978) (internal quotation marks and citation omitted). This "fair notice principle … is grounded on the assumption that one should be free to choose between lawful and unlawful conduct." *Id.* at 121. And we will find a statute void for vagueness "if it lacks fixed enforcement standards or guidelines and thus impermissibly delegates basic policy matters to police[], judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Eanes*, 318 Md. at 459 (internal quotation marks and citation omitted).

A person who is aggrieved by a statute may challenge it as void for vagueness either as applied to that person or on its face. *See Galloway*, 365 Md. at 616-17 & n.12. When a person complains that a statute is impermissibly vague as applied, the court reviews the application to the "facts at hand." *Id.* at 616. That is, the court considers whether the statute provided fair prior notice to the person that the specific conduct he or she committed violated the law. When a person asserts a facial vagueness challenge to a statute, the person "must establish that there is no set of circumstances under which the [statute] would be constitutional." *Motor Vehicle Admin. v. Seenath*, 448 Md. 145, 181 (2016) (internal quotation marks and citation omitted); *see also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982) (challenger to statute must show that the law is "impermissibly vague in all of its applications").

*a. A Facial Vagueness Challenge to the 300-foot Rule Is Permissible.*

The circuit court invalidated the 300-foot rule as vague on its face. On appeal, the Food Trucks defend this ruling.[17] In response, the City first argues that a facial vagueness challenge to the 300-foot rule is improper because the Rule does not implicate the First Amendment or another fundamental right. In essence, the City contends that, if the Food

---

[17] At oral argument, the Food Trucks confirmed that they are not asking this Court to find the 300-foot rule vague, as applied. This concession is sensible, given that neither Pizza di Joey nor Madame BBQ has ever been cited for violating the 300-foot rule. Thus, there is no set of facts "at hand" against which we could assess whether the Food Trucks received sufficient prior notice that their conduct violated the Rule. In other words, a pre-enforcement challenge to the 300-foot rule is, by definition, a facial challenge. *See Act Now to Stop War and End Racism Coalition and Muslim Am. Soc'y Freedom Found. v. District of Columbia*, 846 F.3d 391, 410 (D.C. Cir. 2017) (noting that a pre-enforcement vagueness challenge is "by its nature facial").

Trucks had raised a pre-enforcement facial vagueness challenge to the 300-foot rule, the circuit court would have been foreclosed from considering its merits. We disagree with the City on this point.

The City is correct that a person may assert a facial vagueness challenge if the challenged statute implicates the First Amendment or another fundamental right. *See Seenath*, 448 Md. at 181-83; *Galloway*, 365 Md. at 616 n.11. However, the City overlooks that this is not the only basis for proceeding on a pre-enforcement void-for-vagueness claim. Rather, "facial challenges are appropriate in two circumstances: (1) when a statute threatens to chill constitutionally protected conduct (particularly conduct protected by the First Amendment); or (2) when a plaintiff seeks pre-enforcement review of a statute because it is incapable of valid application." *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1179-80 (2009); *see also Village of Hoffman Estates*, 455 U.S. at 494-95. Thus, this Court, the Supreme Court, and other state and federal courts have entertained pre-enforcement facial vagueness challenges where there was no "fundamental" right alleged to be at stake. *See, e.g., Tidewater/Havre de Grace, Inc. v. Mayor & City Council of Havre de Grace*, 337 Md. 338, 350 (1995) (deciding pre-enforcement facial vagueness claim as part of declaratory judgment action filed by marinas challenging Havre de Grace's ordinance requiring marinas to collect and remit docking and storage fees); *Village of Hoffman Estates*, 455 U.S. at 489, 497 (explaining that "[a] law that does not reach constitutionally protected conduct and therefore satisfies the overbreadth test may nevertheless be challenged on its face as unduly vague, in violation of due process" and reaching merits of pre-enforcement facial vagueness challenge to town ordinance that required a business to

48

obtain a license to sell any items that were "designed or marketed for use with illegal cannabis or drugs"); *Lexington Fayette Cty. Food & Beverage Ass'n v. Lexington-Fayette Urban Cty. Gov't*, 131 S.W.3d 745, 756 (Ky. 2004) (considering pre-enforcement vagueness challenge and invalidating a portion of local government's anti-smoking law as void for vagueness).

The Food Trucks' defense of the circuit court's vagueness ruling implicates the second of the two scenarios for a facial vagueness challenge, i.e., when a plaintiff seeks pre-enforcement review of a statute because it is incapable of valid application.[18] Indeed, the Food Trucks expressly argue that "[i]n *no* instance does a vendor receive fair

---

[18] In *Seenath*, we stated that the plaintiff (on judicial review of an adverse administrative ruling) could proceed on a facial vagueness challenge to the language of the Motor Vehicle Administration's DR-15 Advice of Rights form, where the challenge implicated the continued possession of a driver's license. *Seenath*, 448 Md. at 182-83. Although we observed that, "[t]ypically, a facial challenge in which a party contends that a statute is void-for-vagueness arises out of a right under the First Amendment to the United States Constitution," we found significant that other types of facial challenges "have arisen out of fundamental constitutional rights other than those that the First Amendment protects," including the rights to substantive due process and equal protection under Article 24. *Id.* at 182 (citing *Tyler v. City of College Park*, 415 Md. at 502, and *Griffin v. Bierman,* 403 Md. 186, 195-96 (2008) (where this Court considered "a facial challenge to the Maryland foreclosure notice scheme that arose out of the rights under the Due Process Clauses of the Fourteenth Amendment to the United States Constitution and Article 24 of the Maryland Declaration of Rights") (internal quotation marks omitted)). We recognized that "the continued possession of a driver's license may become essential to earning a livelihood," thereby requiring due process before this "entitlement" may be taken away. *Id.* at 183 (internal quotation marks and citation omitted). For this reason, "[a]s did the parties who raised facial challenges that arose out of the right to due process in *Tyler* … and *Griffin*," we stated that the plaintiff in *Seenath* could assert a facial vagueness challenge "that arises out of the right to due process." *Id.* Because we conclude that a void-for-vagueness challenge to the 300-foot rule is permissible under the second rationale for a facial vagueness challenge, we need not decide whether the Food Trucks have established that a vagueness challenge here also "arise[s] out of [a] fundamental constitutional right[]." *Id.* at 182.

notice of what the ban prohibits. And in *every* instance, officials enforce the ban based on their own subjective belief of what it prohibits."

A facial vagueness challenge is appropriate where, due to a lack of guiding standards, there is a high risk that authorities necessarily will enforce the law arbitrarily. *See Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983) ("Where the legislature fails to provide such minimal guidelines, a criminal statute may permit a standardless sweep" that allows enforcement authorities "to pursue their personal predilections.") (internal quotation marks and citation omitted). Although we ultimately conclude that the 300-foot rule is not impermissibly vague, the acknowledgment by City officials that it enforces the Rule on a case-by-case basis, through the use of common sense, is sufficient to justify a pre-enforcement facial vagueness challenge. This is especially appropriate because the City's stated policy is to enforce the Rule, not by filing a criminal charge, issuing a civil citation, or suspending/revoking a mobile vendor's license, but rather by asking mobile vendors to move when nearby restaurants complain. Indeed, as discussed above, no mobile vendor has had its license suspended or revoked, received a civil citation, or been charged criminally for allegedly violating the 300-foot rule. If we accepted the City's argument that a facial vagueness challenge could not be brought in these circumstances, it appears that the alleged facial vagueness of the Rule would never be subject to challenge, at least so long as the City continued to enforce the Rule through means that do not permit an as-applied vagueness challenge in the first instance. We decline to make the reviewability of the 300-foot rule's alleged vagueness contingent on the City's chosen means of enforcement. Thus, we will address the merits of the circuit court's vagueness ruling.

*b. The 300-foot Rule Is Not Impermissibly Vague.*

The City argues that the circuit court erred in finding the 300-foot rule void for vagueness because: (1) the Food Trucks have not shown that there is no set of circumstances under which the Rule is valid; and (2) even if the Food Trucks need not show that the Rule is vague in all its applications, it is not so broad as to be susceptible to irrational and selective patterns of enforcement. We agree.

As stated above, in order to prevail on a facial vagueness claim, the person challenging the statute must show that there is no set of circumstances under which the statute would be constitutional. *Seenath*, 448 Md. at 181; *Village of Hoffman Estates*, 455 U.S. at 494 (challenged statute will be upheld unless it is "impermissibly vague in all of its applications"). Although the Food Trucks contend that they meet this test, it is plain that they do not. Ms. McGowan herself testified that an "easy" scenario for application of the Rule would be if she parked her truck within 300 feet of Harbor Que, a brick-and-mortar barbecue restaurant. Similarly, it seems beyond dispute that Pizza di Joey would violate the Rule if Mr. Vanoni parked his truck within 300 feet of BOP or another brick-and-mortar pizzeria. Indeed, it is useful to recall that both Mr. Vanoni and Ms. McGowan walked through and surveyed specific neighborhoods in the City, and were able to identify so many specific competing restaurants in those neighborhoods that "triggered the 300-foot ban," Brief for the Petitioners at 13, 15, that they became convinced the Rule effectively prevented them from operating in those neighborhoods entirely.

The Food Trucks alternatively argue that the Supreme Court abandoned the no-set-of-circumstances test with respect to facial vagueness challenges in *Johnson v. United*

51

*States*, 135 S. Ct. 2551 (2015). *Johnson* concerned a vagueness challenge to the "residual clause" of the federal Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), which established a mandatory minimum sentence for offenders who have at least three prior convictions for a felony offense involving conduct "that presents a serious potential risk of physical injury to another." To determine whether ACCA's greater sentence applied to a particular defendant, a federal district court had to imagine an "ordinary" version of each of the defendant's potential qualifying prior offenses and assess whether that "abstraction presents a serious risk of physical injury." *Johnson*, 135 S. Ct. at 2557. Because the statute "tie[d] the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements," *id.*, it was not surprising that the Supreme Court and the lower federal courts struggled for many years – and failed – to apply ACCA consistently. *See id.* at 2558-60. In the course of holding ACCA's residual clause void for vagueness, the Court stated:

> [A]lthough statements in some of our opinions could be read to suggest otherwise, our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp. For instance, we have deemed a law prohibiting grocers from charging an "unjust or unreasonable rate" void for vagueness – even though charging someone a thousand dollars for a pound of sugar would surely be unjust and unreasonable. We have similarly deemed void for vagueness a law prohibiting people on sidewalks from "conduct[ing] themselves in a manner annoying to persons passing by" – even though spitting in someone's face would surely be annoying. These decisions refute any suggestion that the existence of *some* obviously risky crimes establishes the residual clause's constitutionality.

*Id.* at 2561 (citations omitted). However, the Court went on also to observe:

> As a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as "substantial risk" to real-

52

world conduct; "the law is full of instances where a man's fate depends on his estimating rightly ... some matter of degree" …. The residual clause, however, requires application of the "serious potential risk" standard to an idealized ordinary case of the crime. Because "the elements necessary to determine the imaginary ideal are uncertain both in nature and degree of effect," this abstract inquiry offers significantly less predictability than one "[t]hat deals with the actual, not with an imaginary condition other than the facts."

*Id.* (citations omitted).

We do not read *Johnson* as doing away with the no-set-of-circumstances test for all facial vagueness challenges. Rather, we agree with the United States Court of Appeals for the Second Circuit that *Johnson* is best understood as an exception to the general no-set-of-circumstances rule, rather than an abrogation of the rule. *Copeland v. Vance*, 893 F.3d 101, 110-11 & n.2 (2d Cir. 2018) (reiterating the no-set-of-circumstances test, but noting that "in certain exceptional circumstances not present here, a criminal statute may be struck down as facially vague even where it has some valid applications"), *cert. denied*, 139 S. Ct. 2714 (2019).

As noted above, in *Seenath*, a post-*Johnson* facial vagueness case, we reiterated the applicability of the no-set-of-circumstances test to facial vagueness challenges brought under Maryland law. *Seenath*, 448 Md. at 181. We discern no reason to deviate from that standard in a case like this one, which does not involve an abstract, judge-created conception of a crime as *Johnson* did, but rather concerns a statute that "call[s] for the application of a qualitative standard … to real-world conduct." *Johnson*, 135 S. Ct. at 2561. Because there are many instances in which it is clear both to mobile vendors and enforcement authorities whether or not the 300-foot rule applies to a particular food truck

parked within 300 feet of a particular restaurant, the Food Trucks cannot show that the 300-foot rule is void for vagueness.

Even if we were prepared to abandon the no-set-of-circumstances test for facial vagueness challenges in Maryland, we would hold that the 300-foot rule is not impermissibly vague. The words that make up the phrases the circuit court found vague – "primarily engaged in" and "same type" – are common and have generally accepted meanings. For example, "primarily" means "for the most part," Merriam Webster Online Dictionary, available at https://www.merriam-webster.com/dictionary/primarily (accessed on July 14, 2020), archived at https://perma.cc/36Z8-XMCV, and "same" means "resembling in every relevant respect," *id.*, available at https://www.merriam-webster.com/dictionary/same (accessed on July 14, 2020), archived at https://perma.cc/7TU4-3GEY. Just as Mr. Vanoni and Ms. McGowan were able to compare their trucks' menus to the menus of various brick-and-mortar establishments and thereby determine the number of such restaurants that "triggered" the 300-foot rule, we believe enforcement authorities can make fair and reasoned judgments when applying the Rule. *See Bowers*, 283 Md. at 125 (a law "is not vague when the meaning of the words in controversy can be fairly ascertained by reference to judicial determinations, the common law, dictionaries, treatises or even the words themselves"). Indeed, when a University of Maryland police officer approached Mr. Vanoni with a complaint that the Pizza di Joey truck was parked too close to a nearby restaurant, Mr. Vanoni made his case to the officer as to why the brick-and-mortar establishment was not one that primarily engaged in selling the same type of food as Pizza di Joey. The result of that encounter was that, rather than

54

forcing Pizza di Joey to move or citing Mr. Vanoni for violating the 300-foot rule, the officer allowed Pizza di Joey to continue to vend from that location and even bought a slice of pizza himself. We believe this episode demonstrates that enforcement authorities are able to make practical judgments about the applicability of the 300-foot rule based on the particular facts of each situation.

The fact that different enforcement authorities might come to different conclusions about a particular scenario does not trouble us. The Court of Special Appeals undoubtedly was correct that "[t]here may well be close questions about the scope of the 300-foot rule as food trucks grow and spread in Baltimore." *Pizza di Joey*, 241 Md. App. at 181. Regardless, "City enforcement authorities are allowed to exercise reasonable discretion in applying the 300-foot rule." *Id.* at 182; *Bowers*, 283 Md. at 122 (a criminal statute will not be found "void merely because it allows for the exercise of some discretion on the part of law enforcement and judicial officials. It is only where a statute is so broad as to be susceptible to irrational and selective patterns of enforcement" that it will be invalidated as impermissibly vague.).

For these reasons, the 300-foot rule is not impermissibly vague on its face. If the City ever does cite a mobile vendor for violating the 300-foot rule, that vendor will be free to assert an as-applied vagueness challenge if the vendor believes the Rule did not provide fair notice.

## IV

## <u>Conclusion</u>

Nobody disputes that mobile vendors add value to Baltimore City. However, the City acted rationally when it balanced the competing interests of mobile vendors and brick-and-mortar restaurants and enacted the 300-foot rule to further its legitimate interest in promoting the vibrancy of its commercial districts. It follows that the Rule does not deprive mobile vendors of their substantive due process and equal protection rights under Article 24. The Food Trucks affirmatively waived a vagueness challenge to the 300-foot rule, and the circuit court erred in *sua sponte* enjoining the City from enforcing the Rule as impermissibly vague. In any event, the 300-foot rule is not void for vagueness.

Accordingly, we affirm the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONERS.**

IN THE COURT OF APPEALS

OF MARYLAND

No. 41

September Term, 2019

---

PIZZA DI JOEY, LLC AND
MADAME BBQ, LLC

v.

MAYOR AND CITY COUNCIL
OF BALTIMORE

---

McDonald
Watts
Hotten
Getty
Booth
Biran
Raker, Irma S.
    (Senior Judge, Specially Assigned),

    JJ.

---

Dissenting Opinion by Raker, J.

---

Filed: August 17, 2020

Raker, J., dissenting.

I respectfully dissent.  I would hold that this case is not justiciable because it is not ripe for review.[1]  There does not exist an actual controversy to satisfy the ripeness requirement for a declaratory judgment,[2] nor should this Court entertain injunctive relief

---

[1] We noted in *State v. G & C Gulf, Inc.*, 442 Md. 716, 720 n.2, 114 A.3d 694, 696–97 n.2 (2015) as follows:

> "In some of our earlier cases we conflated the concept of 'standing' with ripeness.  *See Hitchcock v. Kloman*, 196 Md. 351, 356, 76 A.2d 582, 584 (1950); *Hammond v. Lancaster*, 194 Md. 462, 471–72, 71 A.2d 474, 477–78 (1950).  In *State Center, LLC*, 438 Md. at 498, 92 A.3d at 428, we distinguished the two doctrines, which fall under the 'umbrella of justiciability.'  Standing refers to whether 'the plaintiff [has] show[n] that he or she is entitled to invoke the judicial process in a particular instance.'  *Id.* at 502, 92 A.3d at 430, quoting *Kendall v. Howard Cnty.*, 431 Md. 590, 593, 66 A.3d 684, 685 (2013).  The issue of ripeness, meanwhile, arises if parties, entitled to invoke the judicial process, ask the court to declare their rights 'upon a state of facts which has not yet arisen, [or] upon a matter which is future, contingent and uncertain.'  *Id.* at 591, 92 A.3d at 484, quoting *Boyds Civic Ass'n v. Montgomery Cnty. Council*, 309 Md. 683, 690, 526 A.2d 598, 602 (1987)."

[2] The Court of Special Appeals explained in *Pizza di Joey, LLC v. Mayor and City Council of Baltimore*, 241 Md. App. 139, 160–61, 209 A.3d 184, 196 (2019) as follows:

> "The declaratory judgment act provides that 'a court may grant a declaratory judgment or decree in a civil case, if it will serve to terminate the uncertainty or controversy giving rise to the proceedings, and if an actual controversy exists between contending parties.'  Md. Code (1974, 2013 Repl. Vol.) § 3-409(a)(1) of the Courts and Judicial Proceedings Article ('CJ').  But a court cannot consider a declaratory judgment action unless the underlying controversy is justiciable.  *State Center,*

(footnote continued . . .)

with respect to a criminal or penal ordinance where there is no prosecution or threat of prosecution. The threshold question for this Court, as presented by respondent the Mayor and City Council of Baltimore ("the City") is justiciability or, more specifically, ripeness of the issue and reads as follows:

> "Did the Food Trucks fail to present an action that was ripe under the meaning of the Declaratory Judgments Act when neither Pizza di Joey nor Madame BBQ was cited for violating the 300-foot rule, neither Food Truck established a negative financial impact from the rule, and the only enforcement officer to consider the rule's application to either of the Food Trucks agreed that Pizza di Joey was not in violation of the ordinance?"

The majority holds that "the Food Trucks' substantive due process and equal protection claims are justiciable." Maj. Op. at 23. The majority finds justiciability because it agrees with the Court of Special Appeals that although "neither Pizza di Joey nor Madame BBQ faced imminent prosecution when they filed their action for a declaration that the 300-foot rule is unconstitutional," they are "indisputably limited in their business." Maj. Op. at 25 (quoting *Pizza di Joey, LLC v. Mayor and City Council of Baltimore*, 241 Md. App. 139, 162–63, 209 A.3d 184, 197 (2019)). The majority explains as follows:

---

> *LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 591, 92 A.3d 400 (2014); *Hatt v. Anderson*, 297 Md. 42, 45, 464 A.2d 1076 (1983) ('the existence of a justiciable controversy is an absolute prerequisite to the maintenance of a declaratory judgment action')."

An "actual controversy" is effectively synonymous with a justiciable controversy. Neither the majority nor the court below has suggested a construction of this language from the declaratory judgment act that would indicate any legislative intent to expand the doctrine of justiciability.

"The intermediate appellate court further explained that the Food Trucks are 'indisputably limited in their business' because the 300-foot rule 'restricts where they can sell and affects their potential profitability.' Rejecting the City's description of the Food Trucks' claims as purely abstract and theoretical, the Court of Special Appeals observed that the controversy's 'contours are visible: the 300-foot rule requires mobile vendors to keep their distance from direct brick-and-mortar competitors, in ways we can measure and draw on maps (as the parties have).' Thus, the court held that the Food Trucks' claims are 'sufficiently concrete and specific to generate a controversy that is ripe for review.' We agree with the Court of Special Appeals' analysis concerning ripeness in this case."[3]

Maj. Op. at 25–26 (internal citations omitted).

As the majority notes, ripeness is a jurisdictional requirement to create a justiciable claim in court. "It is well settled that, 'before addressing any issue raised by the parties, we must be satisfied that there is a justiciable controversy that is ripe for our consideration[.]'" *Tunnell v. State*, 466 Md. 565, 598, 223 A.3d 122, 142 (2020) (Watts, J., dissenting). Therefore, if the claim is not ripe, it is not justiciable. A plaintiff's subjective feeling of inhibition or fear arising from prospective enforcement of a law is not sufficient to establish ripeness. *See Boyle v. Landry*, 401 U.S. 77 (1971). Because I do not agree with the majority that the claim in the present case is ripe and justiciable, I am compelled to dissent.

---

[3] Concreteness and specificity are more commonly discussed in analysis of standing than of ripeness because the Supreme Court of the United States analyzes the injury-in-fact requirement of standing using the terms of concreteness and particularity. Concreteness is relevant to standing and ripeness; concreteness requires more than a hypothetical harm. Absent concrete injury and concrete legal stakes for all litigants, a case is less likely to be fully developed, less likely to be well-litigated, and a court becomes more likely to make imprudent decisions.

"A controversy is justiciable when there are interested parties asserting adverse claims upon a state of facts which must have accrued wherein a legal decision is sought or demanded." *Reyes v. Prince George's Cty.*, 281 Md. 279, 288, 380 A.2d 12, 17 (1977). Addressing non-justiciable issues places courts in the position of rendering purely advisory opinions, a long forbidden practice in this State. *See, e.g.*, *Planning Comm'n v. Randall*, 209 Md. 18, 120 A.2d 195 (1956); *Tanner v. McKeldin*, 202 Md. 569, 97 A.2d 449 (1953); *Hammond v. Lancaster*, 194 Md. 462, 71 A.2d 474 (1950), *cert. denied*, 339 U.S. 908 (1950). That is exactly what this Court is doing—offering an advisory opinion on a misdemeanor action which may never occur.

Judge Battaglia, writing for this Court in *State v. G & C Gulf, Inc.*, 442 Md. 716, 718, 114 A.3d 694, 695–96 (2015), explained the justiciability requirement as follows:

> "We are called upon in this case, seminally, to address justiciability, which has been defined as, '[t]he quality, state, or condition of being appropriate or suitable for adjudication by a court.' Black's Law Dictionary 997 (10th ed. 2014). The doctrine has been 'developed to identify appropriate occasions for judicial action.' *State Center, LLC v. Lexington Charles Ltd. Partnership*, 438 Md. 451, 498, 92 A.3d 400, 427 (2014), quoting 13 Charles Alan Wright, et al., Federal Practice and Procedure § 3529, at 611 (3d ed. 2008). Issues of justiciability may encompass unripe and moot controversies, abstract or hypothetical disputes, collusive lawsuits and claims by disinterested plaintiffs. John A. Lynch, Jr. & Richard W. Bourne, Modern Maryland Civil Procedure 2–8 (2d ed. 2004, 2014 supp.). 'When a court believes a litigant's claim is somehow unfit for judicial determination, it dismisses the claim under the rubric of justiciability.' *Id*. at 2–3. The rationale for the doctrine is that 'addressing non-justiciable issues would place courts in the position of rendering purely advisory opinions, a long forbidden practice in this State.' *State Center, LLC*, 438 Md. at 591, 92 A.3d at 483–84 (internal quotation marks omitted)."

4

In cases seeking to adjudicate constitutional rights, justiciability is especially important, and ordinarily we require concrete and specific issues to be raised in actual cases, rather than as theoretical or abstract propositions. *See, e.g.*, *Salisbury Beauty Schools v. St. Bd. of Cosmetologists*, 268 Md. 32, 300 A.2d 367 (1973); *Thomas v. Solis*, 263 Md. 536, 283 A.2d 777 (1971); *Liberto v. State's Attorney*, 223 Md. 356, 164 A.2d 719 (1960); *Givner v. Cohen*, 208 Md. 23, 116 A.2d 357 (1955).

The existence of a justiciable controversy is an *absolute* prerequisite to the maintenance of a declaratory judgment action in Maryland. *Hatt v. Anderson*, 297 Md. 42, 45, 464 A.2d 1076, 1078 (1983); *Kronovet v. Lipchin*, 288 Md. 30, 58, 415 A.2d 1096, 1112 (1980); *Reyes*, 281 Md. at 287, 380 A.2d at 17; *Haminton v. McAuliffe*, 277 Md. 336, 339, 353 A.2d 634, 637 (1976). In Maryland, "[a]n action for declaratory judgment is not treated differently than any other suit for purposes of ripeness." *G & C Gulf*, 442 Md. at 720, 114 A.3d at 697; *see also State Center, LLC v. Lexington Charles Ltd. Partnership*, 438 Md. 451, 591, 92 A.3d 400, 484 (2014); *Hatt*, 297 Md. at 45, 464 A.2d at 1078. It has long been the law in Maryland that the declaratory judgment process is not available to decide purely theoretical questions or questions that may never arise. *Prince George's Co. v. Chillum-Adelphi*, 275 Md. 374, 340 A.2d 265 (1975); *Liss v. Goodman*, 224 Md. 173, 167 A.2d 123 (1961); *Davis v. State*, 183 Md. 385, 37 A.2d 880 (1944).

Simply reading our jurisprudence on the subject leads to the conclusion that we do *not* dispense with the ripeness requirement merely because the criminal ordinance

addresses economic regulation. In *G & C Gulf*, which concerned a criminal statute[4] addressing an economic issue related to regulating towing companies, this Court held that there was not a justiciable controversy because "G & C Gulf has not alleged nor proven that it has been prosecuted under the statute nor, in actuality, threatened with prosecution." 442 Md. at 734, 114 A.3d at 705. The plaintiff in that case did not aver that it had violated or intended to violate the statute in question but alleged that its "rights, duties, status and legal relations are affected by" the statute and that it was "in jeopardy of being charged with criminal offenses" under the statute. *Id.* at 722, 735, 114 A.3d at 698, 705. We explained that "the mere existence of a criminal statute," even if unconstitutional, and a "hypothetical threat" of prosecution is not sufficient for ripeness requirements. *Id.* 731–32, 114 A.3d at 703–04 (citing *Hammond*, 194 Md. at 473–74, 71 A.2d at 478–79 (holding that the suit challenging the constitutionality of a penal statute was not justiciable "as, none of the complainants had been threatened with prosecution, nor did they allege any facts to indicate that they had violated, or were about to violate, any of the criminal provisions of the Act")); *see also WAAM, Inc. v. Ober*, 199 Md. 203, 208, 86 A.2d 399, 402 (1952) (affirming dismissal of declaratory judgment action alleging unconstitutionality of a criminal ordinance prohibiting advertising on Sundays, because plaintiff had not been prosecuted nor threatened with prosecution).

---

[4] "A violation of [the statute at issue] is a criminal offense and subjects the violator 'to a fine of not more than $500 or imprisonment for not more than 2 months or both.' Md. Code Ann., Transp. § 27-101(c)(25)." *G & C Gulf*, 442 Md. at 720, 114 A.3d at 696.

Also, in *G & C Gulf*, a county representative, whose police force was charged with enforcing the statute, testified at trial that the county was "enforcing [the statute] now because it is the law" and answered in the affirmative the trial judge's question as to whether she was "ready to charge and prosecute or at least take to the Commissioner's Office the Plaintiff." 442 Md. at 727, 114 A.3d at 701. The plaintiff later filed a post-hearing memorandum related to ripeness, in which it posited that this affirmative answer by the county representative was a judicial admission[5] of a credible threat of prosecution. But we held that these statements could not "constitute a credible threat of enforcement, because, for the purported threat to constitute a threat of prosecution for purposes of ripeness, it must be specific to the litigant." *Id.* at 735, 114 A.3d at 705. The county representative had not "specifically utter[ed] a threat of enforcement towards the litigant" but had "merely affirmed that the County would enforce the statute because it is the law." *Id.*

The same is true in the instant case. The Food Trucks' claims are not ripe for review because no credible threat of prosecution for the acts proscribed by the statute have been alleged or established. Neither Pizza di Joey nor Madame BBQ has been cited under the 300-foot rule ("Ordinance"), nor can either party point to a credible threat of prosecution.

---

[5] "A judicial admission is an express waiver made in court or before trial by the party or his attorney conceding for the purposes of the trial the truth of some alleged fact. The party with the burden of proof is, therefore, relieved of that burden and the fact is deemed proved." *Bellamy v. State*, 403 Md. 308, 327 n.19, 941 A.2d 1107, 1118 n.19 (2008) (quoting 2 Wharton's Criminal Evidence § 6:16 (15th ed. 2001)).

Madame BBQ was not even licensed to operate in the City until a few weeks before trial.[6] Pizza di Joey's sole encounter with the enforcement of the Ordinance in the City consisted of a statement by a University of Maryland Police Officer, who did not have the authority to enforce the Ordinance,[7] that there was a complaint that he was violating the Ordinance. This incident resolved on the spot with the officer agreeing that Pizza di Joey was *not* in violation of the Ordinance and that he could continue selling there; and incredibly, the officer returned later and bought some pizza. Pizza di Joey was not threatened with prosecution for violating the Ordinance. That Pizza di Joey decided subsequently not to operate in the City for fear of further encounters with police with power to enforce the Ordinance does not establish prosecution or a credible threat of prosecution.

The majority states that the City, "[i]mplicitly recognizing the soundness of the Court of Special Appeals' holding on ripeness," "shifted the focus of its justiciability argument in this Court" to standing—another element of justiciability. Maj. Op. at 26. But the City made no such implicit concession. The City has continued to argue that the Food Trucks' claims are not ripe because they failed to allege and prove prosecution or a credible threat of prosecution. Respondent's Brief at 15–16. In response to the Food Trucks' argument seemingly that "infringement of their interest in pursuing a business opportunity"

---

[6] Before receiving this license, Madame BBQ's only experience operating in the City was limited to parties and festivals in which enforcement of the Ordinance was not an issue.

[7] The City designee Gia M. Montgomery stated this fact in her deposition.

8

is *an alternative, independent basis of justiciability* for their declaratory judgment action,[8] the City has added merely that the Food Trucks also fail to meet that standard by failing to show the requisite "direct effect" or "quantifiable financial impact" needed under that standard. Respondent's Brief at 16–17 (citing *Bruce v. Dir., Dep't of Chesapeake Bay Affairs*, 261 Md. 585, 276 A.2d 200 (1971); *Davis v. State*, 183 Md. 385, 37 A.2d 880 (1944)).

The Court of Special Appeals had explained this seemingly alternative, independent basis of justiciability applicable in this case as follows:

> "When considering a statute's constitutionality, we are more concerned with its substance than its label, and so too when we assess the ripeness of the Food Trucks' challenge here. *Although designated a misdemeanor, the 300-foot rule is, in substance and application, a local economic regulation. The primary injury the Food Trucks allege is not the possibility of prosecution*, which the Court of Appeals has rejected as non-justiciable, *see, e.g.*, *G & C Gulf, Inc.*, 442 Md. at 732, *but the loss of their right to pursue a business opportunity in their chosen profession, an interest that qualifies readily as a basis for a declaratory judgment. See, e.g.*, *Bruce v. Dir., Dep't. of Chesapeake Bay Affairs*, 261 Md. 585, 595 (1971), quoting *Davis*, 183 Md. at 389 ('[I]n this case complainant is affected by the [statute] and he is entitled to apply for declaratory judgment under the uniform act, rather than run the risk of being subjected to criminal prosecution.'); *Oyarzo v. Md. Dep't of Health and Mental Hygiene*, 187 Md. App. 264, 275 (2009) ('[T]he right [the challenger] seeks to protect is the right to pursue a business opportunity. . . . There is no need for [him] to violate the challenged regulation in order for us to consider

---

[8] The Maryland Declaratory Judgments Act expressly provides that "any person . . . whose rights, status, or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status, or other legal relations under it." Md. Code, Courts and Judicial Proceedings, § 3-406.

whether it was within the scope of the Department's authority to adopt [the regulation at issue].').

*Pizza di Joey*, 241 Md. App. at 162, 209 A.3d 184 at 197 (emphasis added). The majority seems to agree with the intermediate court that the loss of the Food Trucks' right to pursue a business opportunity in their chosen profession constitutes an alternative, independent basis for their declaratory judgment action and that the basis has been met. Because the Food Trucks are "indisputably limited in their business" as the Ordinance "restricts where they can sell and affects their potential profitability," the majority agrees with the intermediate court that their claims are "sufficiently 'concrete and specific' to generate a controversy that is ripe for review." Maj. Op. at 25–26.

Ordinarily, the loss of one's right to pursue a business opportunity (changing a business plan) in one's chosen profession is *not* an alternative, independent basis for ripeness and justiciability of a declaratory judgment action challenging a *criminal* statute. In *Davis v. State*, 183 Md. 385, 389, 37 A.2d 880, 883 (1944), in considering a declaratory judgment action involving a criminal statute, we adopted the following rule:

> "[A] person may obtain a judgment under the Uniform Declaratory Judgments Act declaring whether or not a statute is constitutional, and that a proper case for rendition of such a declaratory judgment is presented when the plaintiff alleges that he will be *directly damaged* in person or in property if the statute is enforced, and such enforcement will result in the infringement of his constitutional rights, and the defendant is charged with the duty of enforcing the statute and *is enforcing it or is about to enforce it*."

183 Md. at 389, 37 A. 2d at 883 (emphasis added). The Ordinance (a/k/a 300-foot rule) is a criminal statute regardless of any economic aspect. As the trial judge cogently stated, "*It*

10

*is important to note that a violation of the 300-foot rule is a crime.* Art. 15, Section 17-42, labeled '*Criminal* Penalties,' states, '[a] person who violates [this Ordinance] is guilty of a *misdemeanor* and, on conviction, is subject to a penalty of $500 for each offense.'" (Emphasis added). Hence, in the present case, the alternative, independent basis does not apply. Even under *Davis*, the Food Trucks, to establish the ripeness of their claim, must prove more than the mere loss of their right to pursue a business opportunity—*e.g.*, a direct damage and an actual threat of enforcement or prosecution against them.

Even assuming, without conceding, that actual threat of enforcement is unnecessary, there is no evidence in this record that either Pizza di Joey or Madame BBQ ever suffered any direct effect or quantifiable financial loss because of the Ordinance. The majority holds as follows:

> "The Food Trucks sufficiently established that they are aggrieved by the 300-foot rule. . . . [T]he Food Trucks specifically altered their business plans as a result of the 300-foot rule. We are also satisfied by our review of the record that, but for the Rule, Pizza di Joey and Madame BBQ both would have received substantial revenues from operating in Hampden and Federal Hill."

Maj. Op. at 28–29. I do not believe that *altering a business plan* is a cognizable injury for the justiciability of a declaratory judgment action challenging the constitutionality of a criminal statute or ordinance or to enjoin the enforcement of a penal ordinance. Moreover, the Food Trucks did not offer any evidence "that, but for the Rule, [they] both would have received substantial revenues from operating in Hampden and Federal Hill." They seem to have taken as given, without offering any evidence, that their revenue and profitability will increase substantially by operating in any areas they wish in Hampden and Federal

11

Hill.[9]  But this is a sheer speculation that does not account for any of the numerous variables involved, *e.g.*, increased competition and preferences of different customer segments.  The Food Trucks' unsupported speculation is not sufficient to satisfy the jurisdictional justiciability requirement.

I conclude with a question: What has become of this Court's long standing mantra that "this Court has 'long forbidden' the practice of issuing an advisory opinion concerning an issue that is not 'ripe'"?  *Twigg v. State*, 447 Md. 1, 19 n.11, 133 A.3d 1125 (2016) (citing *Hickory Point P'ship v. Anne Arundel Cty.*, 316 Md. 118, 129, 557 A.2d 626, 631 (1989) (quoting *Boyds Civic Association v. Montgomery Cty. Council*, 309 Md. 683, 690, 526 A.2d 598, 601 (1987) and *Hatt*, 297 Md. at 46, 464 A.2d at 1078)).  Justiciability, or ripeness, is a jurisdictional component.  This Court lacks jurisdiction to address this appeal.

---

[9] The City notes that "neither Pizza di Joey nor Madame BBQ ever sought clarification from the City, nor did they ever receive any official determination that any given spot where they desired to vend was prohibited by the 300-foot rule.  They made their own assumptions about certain spots being off-limits[.]"  Respondent's Brief at 18.